LARRY E. TUCKER, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3165–06L.          Filed July 26, 2010.

P filed income tax returns for 2000, 2001, and 2002 that reported tax due; but he did not pay the tax. The Internal Revenue Service (IRS) assessed the tax and issued to P a notice of the filing of a tax lien (NFTL). P timely requested a collection due process (CDP) hearing, which is to be "conducted by an officer or employee" of the IRS Office of Appeals, I.R.C. sec. 6320(b)(3), and which is to conclude with a "determination by an appeals officer", I.R.C. sec. 6330(c)(3). P's CDP hearing was conducted by a settlement officer in the IRS Office of Appeals, and after the CDP hearing a team manager in that office issued to P a notice of determination upholding the NFTL. P filed with the Tax Court a timely appeal pursuant to I.R.C. sec. 6330(d)(1). After initial proceedings, this Court ordered a remand to the Office of Appeals for further consideration. A second CDP hearing was conducted by another settlement officer, and the team manager issued a supplemental notice of determination again upholding the NFTL. The team manager and both settlement officers had been hired by the Commissioner pursuant to I.R.C. sec. 7804(a) and were not appointed by the President or the Secretary of the Treasury. P moved for a second remand so that a CDP hearing could be conducted by, and a notice of determination issued by, an officer appointed by the President or the Secretary of the Treasury, in compliance with the Appointments Clause. See U.S. Const., art. II, sec. 2, cl. 2. *Held*: An "officer or employee" or an "appeals officer" under I.R.C. sec. 6320 or 6330 is not an "inferior Officer of the United States" for purposes of the Appointments Clause. P's motion to remand will be denied.

*Carlton M. Smith*, for petitioner.*
*Matthew D. Lucey*, for respondent.

*The following students assisted Professor Smith: Tanyika Brime, Anya Ferris, Lisa Gordon, Marisa Harris, Samir Ismayilov, Shay Moyal, Cheryl Scher, Elisa Vega, Scott Weese, and Jeremy Zenilman.

Briefs amicus curiae were filed by *A. Lavar Taylor* as counsel for the Center for the Fair Administration of Taxes. The following students assisted Professor Taylor: Joe Bosik, Habbib Hanna, and Kelly Regan.

## CONTENTS

Background ................................................................................. 117
Discussion .................................................................................. 119

  I.   The Appointments Clause ........................................... 120
     A.   The purposes of the Appointments Clause ............................ 120
     B.   The distinctions in the Appointments Clause: "Officers",
          "inferior Officers", and non-officer employees .................. 122
        1.   "Principal" officers vs. "inferior" officers ........................... 122
        2.   "Officers" vs. non-officer employees ................................... 123
     C.   Modes of appointment under the Appointments Clause ....... 125
     D.   Appointment of revenue personnel in the late 18th century 126
        1.   The Department of the Treasury ....................................... 127
        2.   External revenue collection ............................................... 127
        3.   Internal revenue collection ............................................... 129
     E.   Subsequent appointment of internal revenue personnel ...... 133

  II.   The Internal Revenue Service Office of Appeals ...................... 134
     A.   The legal basis for the Office of Appeals ............................... 134
     B.   A brief history of the Office of Appeals ................................. 135
     C.   "Appeals Officers" in the Office of Appeals ........................... 136
        1.   The Pre-CDP Role of the "Appeals Officer" ........................ 136
        2.   "Collection Due Process" procedures added to the Code
            in 1998 .......................................................................... 137
        3.   Post-CDP hearing procedures ............................................ 140
        4.   The tax administration context of the CDP "officer or
            employee" ...................................................................... 149
        5.   The administrative law context of the CDP "officer or
            employee" ...................................................................... 151

  III.   The status of the CDP "officer or employee" and "appeals
        officer" under the Appointments Clause ............................. 152
     A.   Whether the position is "established by Law" ....................... 152
        1.   Creation by statute ............................................................ 152
        2.   Creation by regulation ....................................................... 156
     B.   Whether the CDP function could constitute an "office" ........ 159
        1.   Whether the CDP provisions created a "continuing"
            position ............................................................................ 160
        2.   Whether the CDP hearing officer has "significant
            authority" ........................................................................ 160

Conclusion .................................................................................. 165

## OPINION

GUSTAFSON, *Judge*: This case is an appeal, pursuant to section 6330(d)(1),[1] by which petitioner Larry E. Tucker seeks this Court's review of a determination by the Office of

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code ("Code", 26 U.S.C.).

Appeals of the Internal Revenue Service (IRS) to sustain the filing of a notice of lien in order to collect Mr. Tucker's unpaid income taxes for the years 2000, 2001, and 2002. That determination was made after the Office of Appeals conducted a collection due process (CDP) hearing pursuant to section 6330(c) and a supplemental CDP hearing pursuant to a remand of this Court. The determination was reflected in an initial "Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330" and in a "Supplemental Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330". We will eventually review the merits of that collection determination.[2]

Currently before us, however, is Mr. Tucker's motion for remand. That motion presents a question not about Mr. Tucker's tax liabilities nor about the collection decisions of the Office of Appeals in this case but about the constitutional validity of that Office's staffing of CDP proceedings that it conducts pursuant to section 6330(c). The settlement officers who conducted Mr. Tucker's CDP hearings and the team manager who signed and issued the notices of determination were all hired by the Commissioner of Internal Revenue pursuant to section 7804(a) and were not appointed by the President or the Secretary of the Treasury. Mr. Tucker contends, however, that the "appeals officer" in section 6330(c) is an "Officer of the United States" who, according to the Appointments Clause of Article II, Section 2, of the U.S. Constitution, must be appointed either by the President or by one of "the Heads of Departments" (in this case, the Secretary of the Treasury). Because the settlement officers who handled Mr. Tucker's CDP proceeding were not so appointed, Mr. Tucker contends that he has not yet been given the CDP hearing that Congress mandated, and he asks us to remand the matter for a valid hearing before a duly appointed officer.

We will deny Mr. Tucker's motion to remand. We hold that the "officer or employee" in section 6320(b)(3) or 6330(b)(3), also referred to as an "appeals officer" in section 6330(c)(1) and (3), is not an "Officer of the United States" subject to the

---

[2] In addition to the motion to remand that we address in this Opinion, there are also pending before us both respondent's motion for summary judgment asking the Court to sustain the supplemental notice of determination and Mr. Tucker's cross-motion for summary judgment asking that we hold that the supplemental notice reflected an abuse of discretion by the Office of Appeals. Those cross-motions address the merits of the CDP determination, and we do not decide them in this Opinion.

Appointments Clause, for two reasons: First, there is no office "established by Law" to which the clause applies; and second, the CDP hearing officer does not exercise the "significant authority" that defines an "office" according to the relevant case law.

## *Background*

The facts pertinent to Mr. Tucker's motion to remand can be stated very succinctly: He properly requested a CDP hearing pursuant to section 6320, and the employees of the Office of Appeals who conducted his CDP hearings and issued his notices of determination were not appointed by the President or the Secretary of the Treasury.

Those facts can be elaborated in somewhat more detail without any dispute, on the basis of the pleadings, the parties' motion papers, and the supporting exhibits attached thereto.

### *Tax years 2000, 2001, and 2002*

Mr. Tucker failed to timely file tax returns for 2000, 2001, and 2002. In June 2003 he filed untimely Forms 1040, "U.S. Individual Income Tax Return", for those years, but he failed to pay any of the income tax liability shown on those returns. The IRS assessed the income tax liabilities that Mr. Tucker had self-reported but not paid. Almost a year later, on May 8, 2004, the IRS sent to Mr. Tucker a "Final Notice—Notice of Intent to Levy and Notice of Your Right to a Hearing", pursuant to sections 6330(a)(1) and 6331(d)(1), advising him of the IRS's intent to levy upon his property. Mr. Tucker did not timely request a hearing under section 6330 with respect to that notice. On July 22, 2004, the IRS sent to Mr. Tucker a "Notice of Federal Tax Lien Filing and Your Right to a Hearing", pursuant to section 6320(a)(1), advising him that the IRS had filed a notice of tax lien against him. Both notices reflected the income tax liabilities for 2000, 2001, and 2002.

### *CDP hearing*

In response to the lien notice (but not the earlier notice of levy), Mr. Tucker submitted to the IRS on August 11, 2004, a Form 12153, "Request for a Collection Due Process

Hearing". The CDP hearing was held as a telephone conference on May 31, 2005, between an IRS settlement officer and Mr. Tucker and his counsel; and subsequently, numerous letters were exchanged between the settlement officer and Mr. Tucker's counsel.

*Mr. Tucker's OIC*

On July 25, 2005, Mr. Tucker's counsel sent to the settlement officer a Form 656, "Offer in Compromise" (OIC), that proposed to settle Mr. Tucker's income tax liabilities for 1999, 2000, 2001, 2002, and 2003 for $36,772 payable in monthly payments of $317 over 116 months. In a letter dated November 18, 2005, the settlement officer rejected the OIC.

*The notice of determination, and the commencement of this case*

On January 9, 2006, a team manager in the Office of Appeals issued to Mr. Tucker a "Notice of Determination Concerning Collection Action(s) under Section 6320 and/or 6330", which determined to uphold the filing of a tax lien as to Mr. Tucker's income tax liabilities for 2000, 2001, and 2002. In response, Mr. Tucker timely filed a petition with this Court.

*Previous Tax Court proceedings, remand to the Office of Appeals, and supplemental notice of determination*

After filing his petition, Mr. Tucker filed a motion for summary judgment on June 9, 2006. Respondent opposed that motion and filed a motion for remand on July 17, 2006. By our order of July 27, 2006, we denied Mr. Tucker's motion for summary judgment and granted respondent's motion to remand the case to the IRS's Office of Appeals for further consideration of Mr. Tucker's July 2005 OIC and for issuance of a supplemental notice of determination no later than October 16, 2006.

The Office of Appeals then assigned a settlement officer (i.e., a different settlement officer from the one who had conducted Mr. Tucker's initial CDP hearing) to conduct a supplemental CDP hearing and to reconsider Mr. Tucker's July 2005 OIC. The supplemental CDP hearing was held as a telephone conference on September 11, 2006, between the settlement

officer and Mr. Tucker's counsel. On September 12, 2006, the same team manager who had issued the first notice of determination issued a "Supplemental Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330", which determined to reject Mr. Tucker's July 2005 OIC and to uphold the filing of a tax lien as to Mr. Tucker's income tax liabilities for 2000, 2001, and 2002.

*The hiring of the settlement officers and team manager*

Respondent concedes that, to date, no appeals officer, settlement officer, or team manager in the Office of Appeals has been appointed by the President, with or without the advice and consent of the Senate, or by the Secretary of the Treasury. Instead, the Office of Appeals personnel who were involved in Mr. Tucker's case were all hired by the Commissioner pursuant to section 7804(a).

*Mr. Tucker's motion to remand*

In response to the supplemental notice of determination, on November 21, 2006, Mr. Tucker filed an amendment to petition with this Court in order to appeal the supplemental notice of determination. On November 29, 2007, respondent filed a motion for summary judgment asking the Court to sustain the supplemental notice of determination. Mr. Tucker filed a cross-motion for summary judgment on February 27, 2008, and filed a motion for remand on September 2, 2008. We reserve the issues raised by the parties' cross-motions for summary judgment, and we now address Mr. Tucker's motion for remand.

## *Discussion*

To consider the applicability of the Appointments Clause to the "officer or employee" under sections 6320(b)(3) and 6330(b)(3), we first analyze the origin and purposes of the Appointments Clause, then describe generally the Office of Appeals and its CDP function, and then apply Appointments Clause analysis to the role of the CDP "officer or employee".

I. *The Appointments Clause*

A. *The purposes of the Appointments Clause*

The framers of the United States Constitution divided the power of the Federal Government among three branches—legislative, executive, and judicial—as a safeguard against tyranny. The former British colonies had experienced (in the words of the Declaration of Independence) "a long train of abuses and usurpations" by the British monarch, including the abuse that "He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people and eat out their substance." The framers guarded against this particular instance of tyranny—i.e., the power both to erect offices *and* to send out the officers—in the so-called Appointments Clause in Article II, Section 2, of the Constitution, which provides for the appointment of "Officers of the United States":

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The Constitution itself provided explicitly for the appointment of very few Federal officials, and it left to future political process the creation of the great majority of "Officers of the United States" in the executive and the judiciary. It provided that their offices would be "established" by the Congress but "appoint[ed]" by persons outside the Congress.

The Appointments Clause has four related but distinct purposes. First, as we have already noted, the clause is a safeguard against Congress's taking to itself the power to create and fill governmental offices—a reflection of the separation-of-powers framework of the U.S. Constitution. See *Freytag v. Commissioner*, 501 U.S. 868, 878 (1991); The Federalist No. 47 (James Madison), No. 77 (Alexander Hamilton).

Second, the Appointments Clause protects the power of the executive by "preventing the diffusion of the appointment power", that is, by "forbid[ding] Congress to grant the

appointment power to inappropriate members of the Executive Branch". *Freytag v. Commissioner, supra* at 878, 880; see also *Weiss v. United States*, 510 U.S. 163, 188 n.3 (1994) (Souter, J., concurring) ("if Congress, with the President's approval, authorizes a lower level Executive Branch official to appoint a principal officer, it again has adopted a more diffuse and less accountable mode of appointment than the Constitution requires"). When Congress establishes an "inferior Officer" in the Executive Branch, it can vest the appointment power for that officer no further from the President than the Head of a Department whom the President himself has appointed. There is, so to speak, only one degree of separation between any duly appointed officer and the President, thus maintaining the locus of executive power in the President himself.

Third, the Appointments Clause has a closely related democratic purpose: "by limiting the appointment power" to the President and his own immediate and principal appointees,[3] the Framers sought to "ensure that those who wielded it were accountable to political force and the will of the people." *Freytag v. Commissioner, supra* at 884.[4] James Madison argued in The Federalist No. 39 that, because of the Appointments Clause, the "officers of the Union, will * * * be the choice, though a remote choice, of the people themselves".

Fourth:

This disposition was also designed to assure a higher quality of appointments: The Framers anticipated that the President would be less vulnerable to interest-group pressure and personal favoritism than would a collective body. "The sole and undivided responsibility of one man will naturally beget a livelier sense of duty, and a more exact regard to reputation."

---

[3] The Constitutional Convention did not accept a proposal by James Madison that "'Superior Officers below Heads of Departments ought in some cases to have the appointment of the lesser offices.'" *Freytag v. Commissioner*, 501 U.S. 868, 884 (1991) (quoting 2 Records of the Federal Convention of 1787, at 627–628 (M. Farrand ed. 1966)). *Non*-officer employees *may* be hired by "Superior Officers below Heads of Departments" (e.g., by the Commissioner of Internal Revenue), but under the Appointments Clause as promulgated by the Convention and ratified by the States, "Officers of the United States" may not be so hired.

[4] See also *Edmond v. United States*, 520 U.S. 651, 663 (1997) (the Appointments Clause was "designed to preserve political accountability relative to important Government assignments"); *Freytag v. Commissioner*, 501 U.S. at 907 (Scalia, J., concurring) ("the heads of departments * * * possess a reputational stake in the quality of the individuals they appoint; and * * * they are directly answerable to the President, who is responsible to *his* constituency for their appointments and has the motive and means to assure faithful actions by his direct lieutenants").

*Edmond v. United States*, 520 U.S. 651, 659 (1997) (quoting The Federalist No. 76, at 387 (Alexander Hamilton, M. Beloff Ed. 1987)).

B. *The distinctions in the Appointments Clause: "Officers", "inferior Officers", and non-officer employees*

1. *"Principal" officers vs. "inferior" officers*

The rules of the Appointments Clause apply to "*all* other Officers of the United States" (emphasis added), i.e., to officers other than those whose appointment is provided elsewhere in the Constitution. As a result, "all persons who can be said to hold an *office* * * * were intended to be included within one or the other of these modes of appointment". *United States v. Germaine*, 99 U.S. 508, 510 (1879) (emphasis added). As a general rule, then, all "officers" must be nominated by the President and confirmed by the Senate.

The Appointments Clause makes an explicit distinction of, and includes an exception for, "inferior Officers". The case law applying this exception distinguishes these "inferior officers" from "principal officers". The term "principal officer" is not in the Appointments Clause but is borrowed from the immediately preceding clause (i.e., U.S. Const. art. II, sec. 2, cl. 1), which provides that "The President * * * may require the Opinion in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices". The Constitution thus conceives of "principal officers", who must in every case be nominated by the President and confirmed by the Senate, and "inferior Officers", for whom an exception is allowed. In the case of these inferior officers, "Congress *may* by Law vest" their appointment, "as they [in Congress] think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* cl. 2 (emphasis added).

"The line between 'inferior' and 'principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn." *Morrison v. Olson*, 487 U.S. 654, 671 (1988). But in this case Mr. Tucker contends only that appeals officers are inferior officers, not that they are principal officers, so that the principal-inferior distinction is not at issue.

## 2. *"Officers" vs. non-officer employees*

A distinction implicit in the Appointments Clause is between "Officers", to whom the clause applies, and those employees who are not officers, to whom it does not apply. "The line between 'mere' employees and inferior officers is anything but bright", *Landry v. FDIC*, 204 F.3d 1125, 1132 (D.C. Cir. 2000),[5] but it is the line that must be drawn in this case. The Supreme Court has broadly defined the term "Officer of the United States" as "any appointee exercising significant authority pursuant to the laws of the United States", *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), and "all appointed officials exercising responsibility under the public laws of the Nation", *id.* at 131. The Court has explained, however, that the term "does not include all employees of the United States * * *. Employees are lesser functionaries subordinate to officers of the United States". *Id.* at 126 n.162.[6]

Mr. Tucker does not dispute the existence of this sub-officer category of "lesser functionaries"; he does not argue that all Federal employees are officers who must be appointed. However, lest it be thought that the lack of explicit warrant in the Constitution suggests that non-officer employees cannot properly exist in the Executive Branch, or that they cannot be numerous, it should be noted that the

---

[5] See Jerry L. Mashaw, "Recovering American Administrative Law: Federalist Foundations, 1787–1801", 115 Yale L. J. 1256, 1268 (2006) ("these Federalist-era state builders were not operating with a twenty-first-century kit of administrative understandings either. The idea of 'office,' for example, was highly ambiguous—an unsettled blend of public and private stations. This ambiguity made the legal structure of office-holding problematic along multiple dimensions, from the way 'officers' should be remunerated, to whether and how they were subject to hierarchical direction and control by administrative superiors, to the means and extent to which they should be legally responsible in court"); *id.* at 1319.

[6] Officers of the United States are also "employees" for some purposes—e.g., employment taxes. See sec. 3401(c). However, the case law interpreting the Appointments Clause uses the term "employee" to refer to non-officers, and we follow that usage here. The case law also uses the term "lesser functionary" from *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). Whatever its apparent connotation, that phrase simply starts with the word "functionary"—which comprehends principal officers and inferior officers, see *Ex parte Siebold*, 100 U.S. 371, 397–398 (1880) ("as the Constitution stands, the selection of the appointing power, as between the functionaries named, is a matter resting in the discretion of Congress")—and observes that employees subordinate to those functionaries are "lesser functionaries". The *Buckley* court distinguished "Officers of the United States", who are subject to the Appointments Clause, from non-officer employees who fill "'offices' in the generic sense", 424 U.S. at 138. That is, not every employee with the word "officer" in his job title is subject to the Appointments Clause, see *Steele v. United States*, 267 U.S. 505, 507 (1925) ("the expression 'civil officer of the United States duly authorized to enforce, or assist in enforcing, any law thereof,' as used in the Espionage Act, does not mean an officer in the constitutional sense"), and Mr. Tucker does not contend that "appeals *officers*" are subject to the Appointments Clause simply because of their job title.

same question could arise with respect to the other two branches of Government. The Constitution has no explicit provision whatever that authorizes Senators, Representatives, or congressional committees to hire employees of any sort, whether officers, inferior officers, or lesser functionaries, but it would be absurd to interpret the constitutional silence on this matter as a bar to the legislature's hiring personnel necessary for its constitutionally mandated functions.[7] For many years congressional employees were few in number—but there were always at least a few: By 1792 the list of personnel for the House included the clerk of the House of Representatives, a principal clerk, two engrossing clerks, a chaplain, a sergeant-at-arms, a door-keeper, and an assistant door-keeper, and the list for the Senate included the secretary of the Senate, two clerks, a door-keeper, and an assistant door-keeper[8]—a total of thirteen, none of whom were explicitly authorized in the Constitution. Currently, the total employment of the Senate and House numbers in the thousands.[9]

For the judicial branch the Constitution does include an explicit provision for subordinate personnel, in that the Appointments Clause itself provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in * * * the Courts of Law". That is, it is explicit that "the Courts of Law" may appoint "inferior Officers". The Judiciary Act of 1789, enacted by the first Congress, provided for clerks of court and marshals,[10] and the

---

[7] As one mundane example, Article I, Section 5, Clause 3 of the Constitution requires each House to keep and publish "a Journal of its Proceedings," a function hard to imagine Congress accomplishing without staff.

[8] See "List of Civil Officers of the United States, Except Judges, With Their Emoluments, For the Year Ending October 1, 1792", at 59 (Feb. 27, 1793), printed in I Documents, Legislative and Executive, of the Congress of the United States, at 57–58 (Gales & Seaton, 1834) (hereinafter, "1792 Roll"). Treasury Secretary Alexander Hamilton submitted the 1792 Roll to the Senate with the statement that it constituted "statements of the salaries, fees, and emoluments * * * of the persons holding civil offices or employments under the United States". *Id.* at 57. A decade later, in 1802, the combined staff consisted of 14 persons. See "Roll of the Officers, Civil, Military, and Naval, of the United States", at 302 (Feb. 17, 1802), printed in I Documents, Legislative and Executive, of the Congress of the United States, at 260–319 (Gales & Seaton, 1834) (hereinafter, "1802 Roll"). Treasury Secretary Albert Gallatin transmitted the list to the President with the statement that it was "the list of the several officers of Government * * * as compiled in this or received from the other Departments." President Thomas Jefferson transmitted it to Congress and called it "a roll of the persons having office or employment under the United States."

[9] See U.S. Office of Personnel Management, Federal Employment Statistics, http://www.opm.gov/feddata/html/2009/March/table2.asp.

[10] Act of Sept. 24, 1789, ch. 20, secs. 7, 27, 1 Stat. 76, 97.

1792 Roll, at 59–60, does show such personnel on the list. However, the courts had to maintain courthouses, keep records, and collect fees, [11] functions for which additional employees beyond "inferior *Officers*" would seem to be inevitable, if not initially then at least eventually. Currently the Judicial Branch employs thousands of non-officers. [12]

In any event, the courts have acknowledged the practical necessity for and the propriety of non-officer employees in all three branches, including the executive. Therefore, in this case we do not decide whether such employees are constitutionally possible (they are), but whether CDP "officer[s] or employee[s]" are properly among their number.

## C. *Modes of appointment under the Appointments Clause*

The Appointments Clause provides three modes of appointment for executive officers—i.e., by Presidential nomination and Senate confirmation, by the President alone, or by the Head of a Department. [13] However, as we noted above in part I.B.1, while the Appointments Clause does allow an exception for inferior officers to be appointed by the President alone or by the Secretary, the terms of that exception are that "*Congress may by Law* vest the Appointment" (emphasis added) in the President alone or the Head of a Department. Where Congress has not made any such exception "by Law", then

---

[11] *Id.* secs. 3, 5, 1 Stat. 73, 75; Act of Sept. 29, 1789, ch. 21, sec. 2, 1. Stat. 93.

[12] See U.S. Office of Personnel Management, Federal Employment Statistics, http://www.opm.gov/feddata/html/2009/March/table2.asp.

[13] For purposes of the Appointments Clause, a department is a "'freestanding, self-contained entity in the Executive Branch'". *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. ____, ____, 130 S. Ct. 3138, 3162 (2010) (quoting *Freytag v. Commissioner*, 501 U.S. 868, 915 (1991) (Scalia, J., concurring in part and concurring in judgment)). The parties agree that the "Department" at issue is the Department of the Treasury (created not in Title 26 of the United States Code but in Title 31 ("Money and Finance"), chapter 3), whose head is its Secretary. Respondent does not contend that the IRS itself is a Department nor that the Commissioner is a "Head" who can make appointments under the exception in the Appointments Clause. The IRS operates not under the direct supervision of the President but "under the supervision of the Secretary of the Treasury." Sec. 7801(a); see *Freytag v. Commissioner, supra* at 886 ("the term 'Department' refers only to "'a part or division of the executive government, as the Department * * * of the Treasury,'" expressly 'creat[ed]' and 'giv[en] . . . the name of a department' by Congress. *Germaine*, 99 U.S. at 510–511. * * * Accordingly, the term 'Heads of Departments' does not embrace 'inferior commissioners and bureau officers.' *Germaine*, 99 U.S. at 511"); *Donaldson v. United States*, 400 U.S. 517, 534 (1971) ("the Internal Revenue Service is organized to carry out the broad responsibilities of the Secretary of the Treasury under § 7801(a) of the 1954 Code for the administration and enforcement of the internal revenue laws"); *LaSalle Rolling Mills, Inc. v. U.S. Dept. of Treasury*, 832 F.2d 390, 392 (7th Cir. 1987) ("the IRS * * * is an agency of the Treasury Department").

the default rule applies.[14] Section 7804(a) authorizes the Commissioner to appoint IRS personnel "[u]nless otherwise prescribed by the Secretary". We assume that, by that statutory phrase, Congress has, for purposes of the Appointments Clause, "vest[ed]" in the Secretary the power to appoint IRS personnel if he chooses to so "prescribe". Therefore, if a given IRS position (such as a CDP hearing officer) were found to constitute an "inferior Office[ ]" requiring constitutional appointment, then the Secretary could presumably prescribe that the Secretary would appoint personnel to fill that office, and the requirements of the Appointments Clause would be fulfilled. However, respondent does not contend that the Secretary has made any such prescription or has appointed any personnel in the Office of Appeals. Consequently, their hiring does not conform to the Appointments Clause.

### D. *Appointment of revenue personnel in the late 18th century*

To apply the Appointments Clause to internal revenue personnel who are affected by the 1998 CDP provisions, we take instruction from the manner in which internal revenue personnel were appointed and hired in the years immediately after the Constitution was ratified. Of course, the earliest Congresses and executive administrations were not infallible in their adherence to the Constitution, and their example cannot be followed uncritically; but we do properly note "the early practice of Congress", *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. ___, ___, 130 S. Ct. 3138, 3162 (2010), particularly where it concerns revenue personnel, who were by no means an outlying example of early Federal employment. On the contrary, in that era revenue collection was a significant and conspicuous Federal effort—both quantitatively and qualitatively.[15] Nonetheless,

---

[14] See *Edmond v. United States*, 520 U.S. at 660 ("The prescribed manner of appointment for principal officers is also the default manner of appointment for inferior officers"); see also *Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring) ("any decision to dispense with Presidential appointment and Senate confirmation is Congress's to make").

[15] In the early years of the Republic, external and internal revenue employees were more than half the Federal civilian workforce. See Leonard D. White, The Federalists: A Study in Administrative History 123 (1948). Revenue statutes make up, by pages, roughly 40 percent of the first volume of Statutes at Large. "The revenue statutes were the most complexly articulated administrative system devised by the early Congresses". Mashaw, *supra* at 1278.

very few internal revenue personnel were appointed under the Appointments Clause.

### 1. *The Department of the Treasury*

The Act that established the Department of the Treasury on September 2, 1789, created only six offices—the Secretary, an Assistant to the Secretary, a Comptroller, an Auditor, a Treasurer, and a Register. [16] Nine days later Congress authorized the Secretary to "appoint such clerks * * * as * * * [he] shall find necessary". [17] The organizing Act charged the Secretary "to superintend the collection of the revenue", [18] a function that would obviously require a numerous staff. However, in 1792 the entire staff of the Treasury Department—from Secretary down to "messenger and office-keeper"—consisted of 110 persons.

The personnel actually employed in the collection of revenue were much more numerous and fell into two categories, external and internal. The manner of appointment used in these two categories was notably distinct.

### 2. *External revenue collection*

Before establishing the Treasury Department, Congress had already provided five weeks earlier, in July 1789, for some of the personnel necessary for collection of "external revenue", i.e., duties on imports. [19] Congress had provided that for each port "a naval officer, collector [20] and surveyor

---

[16] Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 (1789). Except for the Assistant to the Secretary, who was to "be appointed by the said Secretary", the statute is not explicit as to who appoints these officers, so the default rule of the Appointments clause applied. The position of Assistant to the Secretary was later replaced by the Commissioner of the Revenue, who was made responsible for "collection of the other revenues of the United States" (i.e., other than "duties on impost and tonnage"). See Act of May 8, 1792, ch. 37, sec. 6, 1 Stat. 280.

[17] See Act of Sept. 11, 1789 ("An Act for establishing the Salaries of the Executive Officers of the Government, with their Assistants and Clerks"), ch. 13, sec. 2, 1 Stat. 68; Act of May 8, 1792, ch. 37, sec. 11, 1 Stat. 281 ("the Secretary of the Treasury be authorized to have two principal clerks"). Consistent with this statutory authorization, the 1792 Roll, at 57–58, lists the officials whose offices were named in the organizing statute, and also lists several "messengers" and "office-keepers".

[18] Act of Sept. 2, 1789, ch. 12, sec. 2, 1 Stat. 65; see also Act of June 5, 1794, ch. 48, sec. 4, 1 Stat. 376, 378 ("the duties aforesaid shall be received, collected, accounted for, and paid under and subject to the superintendence, control and direction of the department of the treasury, according to the authorities and duties of the respective offices thereof"); Act of May 8, 1792, ch. 37, sec. 6, 1 Stat. 280 ("the Secretary of the Treasury shall direct the superintendence of the collection of the duties on impost and tonnage as he shall judge best").

[19] Act of July 31, 1789, ch. 5, secs. 5, 6, 8, 1 Stat. 36–37.

[20] These Presidentially appointed external revenue "collectors" were different from the *internal*

Continued

shall be appointed", presumably by the President.[21] It was the duty of the collector "to employ proper persons as weighers, gaugers, measurers and inspectors * * *, together with such persons as shall be necessary to serve in the boats * * * with the approbation of the principal officer of the treasury department".[22]

The next year, 1790, Congress provided that, for the collection of import duties, "there shall be established and appointed, districts, ports and officers", with one or more districts in every State.[23] The Presidentially appointed posts of "collector, naval officer and surveyor" were retained in this regime, and once again they were to employ "weighers, gaugers, measurers and inspectors", *id.* sec. 6, 1 Stat. 154, presumably with the approval of the Secretary as the previous year's statute had required.[24]

In 1799 Congress authorized the President to build as many as ten ships called "revenue cutters", each to be manned by "one captain or master, and not more than three lieutenants or mates, first, second, and third, and not more

revenue "collectors" authorized in 1798 and appointed by "supervisors", as discussed *infra* p. 131.

[21] Act of July 31, 1789, ch. 5, sec. 1, 1 Stat. 29. The statute does not state by whom the "naval officer, collector and surveyor" would be appointed. However, the preamble to the 1802 Treasury Roll, at 261, describes "[t]he officers employed in the collection of the external revenue" as falling into three groups, one of which consisted of "collectors, naval officers, [and] surveyors" who are said to have been "appointed by the President". The statute also allowed for "other *person*[s] specially appointed by either" the naval officer, collector, or surveyor to search, seize, and secure concealed goods. Act of July 31, 1789, ch. 5, sec. 24, 1 Stat. 43 (emphasis added). However, we infer that those "special" appointments were occasional and temporary; and if so then they did not constitute "offices". See *infra* part III.B.1.

[22] That position of "principal officer" was established a month later as Secretary of the Treasury. See also, to the same effect, Act of Mar. 2, 1799, ch. 22, sec. 21, 1 Stat. 642. Consistent with the 1789 statute, the preamble to the 1802 Treasury Roll states that "port inspectors, weighers, and gaugers" are "appointed by the collectors, with the approbation of the Secretary of the Treasury". We assume that, by virtue of this required "approbation" of the Secretary, these appointments satisfied the Appointments Clause as among those appointments that Congress "vest[ed] * * * in the Heads of Departments". See 4 Op. Atty. Gen. 162 (1843) ("approbation" of the Secretary required for "inspectors of the customs" in Act of Mar. 3, 1815, ch. 94, sec. 3, 3 Stat. 232, constituted appointment by the Secretary for purposes of the Appointments Clause).

[23] Act of Aug. 4, 1790, ch. 35, sec. 1, 1 Stat. 145.

[24] The collector, naval officer, and surveyor were also authorized to name a "deputy" who would serve "in cases of occasional and necessary absence, or of sickness, and not otherwise", *id.* sec. 7, 1 Stat. 155, and would serve in the case of their disability or death "until successors shall be duly appointed", *id.* sec. 8. See also, to the same effect, Act of June 5, 1794, ch. 49, secs. 1, 12, 1 Stat. 378, 380; Act of Mar. 2, 1799, ch. 22, sec. 22, 1 Stat. 644. Because the deputies' positions were only temporary, we assume that they were not "offices" within the meaning of the Appointments Clause, see *infra* part II.B.1, and that the clause is therefore not implicated even where those non-appointed deputies were (temporarily) given substantial authority and discretion.

than seventy men, including *non-commissioned officers, gunners and mariners*."[25] (Emphasis added.) The statute provided that the President appointed the "officers" of the revenue cutters, such as the captains or masters, but did not appoint the numerous others, such as the non-commissioned officers.[26] The same statute authorized the local collectors to "provide and employ such small open row and sail boats, in each district, together with the number of persons to serve in them, as shall be necessary for the use of the surveyors and inspectors in going on board of ships or vessels and otherwise, for the better detection of frauds", but to do so "with the approbation of the Secretary", which we take to constitute an appointment by the Secretary.[27] Cf. *supra* note 24.

Thus, almost all of the persons employed for external revenue collection under the early statutes either were appointed by the President or the Secretary, or else were temporary (i.e., the deputies, occasional inspectors, and persons "specially appointed"). The only permanent non-appointed positions referenced in the statutes were the "non-commissioned officers, gunners and mariners" for revenue cutters.[28]

Thus the Department of the Treasury and its external revenue staff were virtually all "appointed". However, the internal revenue personnel (the predecessors of today's IRS) were treated differently, as we now show.

### 3. *Internal revenue collection*

In 1792 Congress established the office of the Commissioner of the Revenue, who was responsible for collection of internal revenue. See *supra* note 16. In the previous year Congress had already provided that the United States was divided into fourteen districts for the purpose of collecting Federal revenue, both internal and external, and it had

---

[25] Act of March 2, 1799, ch. 22, secs. 97 and 98, 1 Stat. 699.

[26] *Id.* sec. 99, 1 Stat 700. The preamble to the 1802 Roll, at 261, describes "[t]he officers employed in the collection of the external revenue" as falling into three groups, one of which consisted of, inter alia, "masters and mates of revenue cutters" who are said to have been "appointed by the President".

[27] *Id.* sec. 101, 1 Stat. 700. The statute also authorized the collectors to hire temporary and occasional inspectors. *Id.* secs. 14, 19, 38, 53, 1 Stat. 636, 640, 658, 667.

[28] *Id.* secs. 97 and 98. The 1802 Roll does not list "non-commissioned officers, gunners and mariners" but does refer, at 261, to "bargemen employed by collectors". We infer that the 1802 Roll's "bargemen" are these employees named in the statute.

authorized for each district "a supervisor" and "inspectors" who were to be appointed by the President with the advice and consent of the Senate.[29] However, that 1791 Act had also provided "[t]hat the supervisor of each district shall appoint *proper officers* to have the charge and survey of the distilleries within" the district,[30] with no requirement that the Secretary's approval be obtained.

A 1794 internal revenue statute that imposed duties on carriages provided for duties to "be levied, collected, received and accounted for, by and under the immediate direction of the supervisors and inspectors of the revenue, and other officers of inspection".[31] A similar act in 1796, also imposing duties on carriages, referred to "officers or persons employed under" the supervisors and inspectors.[32] In 1798 the supervisors were authorized to hire clerks.[33] These "proper officers" (authorized in 1791), "other officers of inspection" (authorized in 1794), "officers or persons employed under" them (referred to in 1796), and clerks (authorized in 1798) were thus not appointed by the President nor by the Head of a Department.

In July 1798 Congress imposed a direct tax of $2 million, apportioned among the States, to be assessed on "dwelling houses, lands and slaves".[34] In the same month Congress provided for the appointment of additional internal revenue personnel to perform the necessary enumerations and valuations. Act of July 9, 1798 ("An Act to provide for the valuation of Lands and Dwelling-Houses, and the enumeration of Slaves within the United States"), ch. 70, sec. 1, 1 Stat. 580. For revenue purposes Congress subdivided the States into various "divisions", *id.*, and provided that the President would appoint a "commissioner" for each division, *id.* sec. 3,

---

[29] Act of Mar. 3, 1791, ch. 15, sec. 4, 1 Stat. 199.

[30] *Id.* sec. 18, 1 Stat. 203 (emphasis added); see also Act of June 5, 1794, ch. 48, sec. 3, 1 Stat. 377 (referring to "the several officers of inspection acting under" the supervisors).

[31] Act of June 5, 1794, ch. 45, sec. 2, 1 Stat. 374.

[32] Act of May 28, 1796, ch. 37, sec. 11, 1 Stat. 481.

[33] Act of July 11, 1798, ch. 71, sec. 2, 1 Stat. 592; see also Act of Apr. 6, 1802, ch. 19, sec. 5, 2 Stat. 150. In 1805 the Secretary was authorized to employ clerks to serve under the direction of the supervisor of the district of South Carolina. See Act of Jan. 30, 1805, ch. 11, sec. 1, 2 Stat. 311.

[34] Act of July 14, 1798 ("An act to lay and collect a direct tax within the United States"), ch. 75, secs. 1 and 2, 1 Stat. 597, 598. Section 8 of Article I of the Constitution permits Congress "To lay and collect Taxes"; but before the ratification of the 16th Amendment, "No capitation, or other direct, Tax shall be laid, unless in proportion to the Census or Enumeration herein before directed to be taken."

1 Stat. 584. (Each of the commissioners was authorized to appoint a clerk, *id.* sec. 5; and as is noted below, each commissioner was authorized in 1800 to appoint his own "assistant".) The commissioners within the several States were authorized collectively to "divide their respective states into a suitable and convenient number of assessment districts, within each of which *they shall appoint* one respectable freeholder to be *principal assessor*, and such number of respectable freeholders to be *assistant assessors*, as they shall judge necessary for carrying this act into effect". *Id.* sec. 7 (emphasis added). These assessors and assistant assessors (appointed not by the President or the Secretary but by the Presidentially appointed commissioners) were "to value and enumerate the said dwelling-houses, lands and slaves", *id.* sec. 8, 1 Stat. 585, in order to establish the tax base against which the tax would be collected. One commentator observed:

> The tax on land, dwellings, and slaves (1798) * * * involved a wide area of official discretion. It required a valuation of property * * * for which Congress formulated some general rules that left the assessment largely to the judgment of local assessors—but subject to an administrative review.

Leonard White, The Federalists: A Study in Administrative History, 452 (1948).

For the collection itself, the 1798 Act provided that the supervisors (Presidentially appointed) were "authorized and required to appoint such and so many suitable persons in each assessment district within their respective districts, as may be necessary for collecting the said tax". Act of July 14, 1798, ch. 75, sec. 4, 1 Stat. 599. If a property owner did not pay the tax upon demand, then the "collector" (again, appointed not by the President or the Secretary but by the Presidentially appointed supervisors)[35] could "proceed to collect the said taxes, by distress and sale of the goods, chattels or effects of the persons delinquent". *Id.* sec. 9, 1 Stat. 600.

Another statute from 1798 allowed a property owner who disputed a valuation to appeal the matter to the principal assessor. Act of July 9, 1798, ch. 70, secs. 19 and 20, 1 Stat. 588. (No provision is made for a further appeal to the Presidentially appointed commissioner, but the commissioner did

---

[35] The 1802 Roll, at 261, confirms that the "collectors and auxiliary officers [were] appointed by the supervisors".

have the power "to revise, adjust and vary the valuations * * * as shall appear to be just and equitable". *Id.* sec. 22, 1 Stat. 589. [36]) The right of appeal from an assessor's valuation did have an exception: Where a property owner had submitted a property list that a court found to be "false and fraudulent", the assessor was authorized to make a valuation and enumeration "from which there shall be no appeal".

This 1798 Act provided for an additional official appointed neither by the President nor by the Secretary: The supervisors and inspectors (i.e., created in the 1791 and 1794 Acts) were authorized "to depute one skilful and fit person, in each assessment district, to be *surveyor of the revenue*". *Id.* sec. 24 (emphasis added). [37] A "surveyor of the revenue" was a position different from the "surveyors" appointed by the President pursuant to the original 1789 Act. The principal duties of the surveyor of the revenue were: (1) to preserve "the records of the lists, valuations and enumerations" made pursuant to the Act; (2) to make appropriate charges and credits when property was sold; (3) to apportion value when property was divided; (4) to value and assess newly built houses; and (5) subject to the approval of the (Presidentially appointed) inspector of the survey, to reduce valuations when property was damaged or destroyed. *Id.* sec. 25. (In 1800 the surveyor of the revenue was also empowered, when property had been omitted from the lists, to "make a list and valuation thereof". [38])

In 1800 the Presidentially appointed commissioners were permitted to hire "such *assistants* as they shall find necessary, and appoint for that purpose", i.e., for the purpose of completing additions to or reductions of assessments that the commissioner has directed. [39]

In sum, the early internal revenue statutes authorized the employment not only of Presidentially appointed supervisors and inspectors but also of the following personnel who were not appointed by the President or the Secretary (and whose positions were not temporary, like the deputies'):

---

[36] See, to the same effect, Act of Jan. 2, 1800, ch. 3, sec. 1, 2 Stat. 4.

[37] See also Act of Jan. 30, 1805, ch. 11, sec. 2, 2 Stat. 312.

[38] Act of May 13, 1800, ch. 60, sec. 1, 2 Stat. 80.

[39] Act of Jan. 2, 1800, ch. 3, sec. 2, 2 Stat. 4 (emphasis added). See also, to the same effect, Act of May 10, 1800, ch. 53, sec. 2, 2 Stat. 72.

- "proper officers to have the charge and survey of the distilleries", Act of Mar. 3, 1791, ch. 15, sec. 18;
- "officers or persons employed under" the supervisors and inspectors, Act of May 28, 1796, ch. 37, sec. 11;
- "clerks" hired by the supervisors and commissioners, Act of July 11, 1798, ch. 71, sec. 2; Act of Apr. 16, 1802, ch. 19, sec. 5;
- "principal assessors" and "assistant assessors", Act of July 9, 1798, ch. 70, sec. 7;
- "collectors", Act of July 14, 1798, ch. 75, secs. 4, 9;
- "surveyors of the revenue", Act of July 9, 1798, ch. 70, sec. 24; and
- "assistants" to the commissioners, Act of Jan. 2, 1800, ch. 3, sec. 2.

The 1802 Roll, at 280–288, lists 16 supervisors and 24 inspectors, thus totaling 40 Presidentially appointed internal revenue personnel. It also lists 40 clerks, 361 collectors, 34 collectors' clerks, and 102 "Auxiliary officers" (apparently a generic term for the other personnel authorized in the statutes). The "collectors and auxiliary officers, *appointed by the supervisors*", *id.* at 261 (emphasis added), are significantly more numerous than the Presidentially appointed supervisors and inspectors.

### E. *Subsequent appointment of internal revenue personnel*

In his first inaugural address, President Thomas Jefferson called for the repeal of the original internal revenue taxes, and that repeal took place in 1802.[40] Thereafter there were four iterations of the internal revenue tax, before the modern regime that is still in place today;[41] and the pattern of appointments that had been set for internal revenue in the late 18th century was followed in those four subsequent internal revenue statutes. That is, non-appointed personnel hired by persons inferior to the Secretary of the Treasury had more than ministerial responsibility in internal revenue statutes enacted during the War of 1812,[42] during the Civil

---

[40] See Act of Apr. 6, 1802, ch. 19, 2 Stat. 148.

[41] See Lucius A. Buck, "Federal Tax Litigation and the Tax Division of the Department of Justice", 27 Va. L. Rev. 873, 875–877 (1941).

[42] See Act of July 22, 1813, ch. 16, secs. 3, 8, 20–22, 3 Stat. 26, 27, 30, 31 (Assistant Assessors could correct fraudulent property lists without any taxpayer appeal right; Deputy Collectors could seize and sell personal and real property).

War and Reconstruction, [43] after the ratification of the 16th Amendment, [44] and in connection with the first World War. [45]

The pattern set in the late 18th century persists today: The general authority of the Secretary of the Treasury is described in 31 U.S.C. sec. 321 (2006), and it does not include employment or appointment of internal revenue personnel. "The Secretary of the Treasury is authorized to appoint * * * such attorneys and other officers and employees as he may deem necessary" in the Customs Service for *external* revenue collection, 19 U.S.C. sec. 2072(a) (2006); but the Secretary does not generally make appointments for *internal* revenue collection. Rather, "the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws". Sec. 7804(a).

## II. *The Internal Revenue Service Office of Appeals*

### A. *The legal basis for the Office of Appeals*

The Office of Appeals is a component of the IRS within the Department of the Treasury. The Office of Appeals was not created by the CDP provisions at issue here (i.e., sections 6320 and 6330), which were added to the Internal Revenue

---

[43] See Act of Aug. 5, 1861, ch. 45, secs. 11, 34, 51, 12 Stat. 296, 303, 310 (Assistant Assessors are described with less detail; Assistant Collectors could levy upon property and could arrest and imprison taxpayers who refused to testify); Act of July 1, 1862, ch. 119, secs. 3, 5, 9, 12 Stat. 433–435 (Assistant Assessors and Deputy Collectors with powers similar to those in 1813); Act of June 30, 1864, ch. 173, secs. 8, 10, 13, 14, 52, 118, 13 Stat. 224–227, 242, 282 (Assistant Assessors and Deputy Collectors were given powers similar to those in 1862 (but arrest power was replaced with summons authority and power to apply to a judge for arrest for contempt), and both could also administer oaths and take evidence; Assistant Assessor could adjust taxable income upward "if he shall be satisfied" that income was understated, with appeal of any such increase to the assessor); Act of Mar. 3, 1865, ch. 78, 13 Stat. 480 (Assistant Assessor can adjust taxable income upward "if he has reason to believe" that income is understated); Act of July 13, 1866, ch. 184, secs. 4, 9, 14 Stat. 99, 126, (Assistant Assessors could give permits for cigar-making; Deputy Collectors could hold cotton until tax on it had been paid); Act of Mar. 2, 1867, ch. 169, secs. 19, 20, 14 Stat. 482 (any internal revenue officer could be authorized to seize property and could seize barrels if they had reason to believe that taxes on them had not been paid); Act of July 14, 1870, ch. 255, sec. 36, 16 Stat. 271 (weighers, gaugers, measurers, and inspectors).

[44] See Act of Oct. 3, 1913, ch. 16, 38 Stat. 169, 179 (a Deputy Collector could demand that a taxpayer show cause why the income amount on the return should not be increased and, if no return or a false or fraudulent return had been provided, could make a return based on the best information he could obtain, which return was then to be held prima facie good and sufficient for all legal purposes).

[45] See Act of Sept. 8, 1916, ch. 463, secs. 16–22, 39 Stat. 774–776 (Deputy Collector had powers similar to those in 1913); Act of Feb. 24, 1919, ch. 18, sec. 1317, 40 Stat. 1146–1148 (Deputy Collector had powers similar to those in 1913 and 1916, and could administer oaths and take evidence).

Code in 1998, nor by the several other provisions of the Code that mention the Office of Appeals. [46] Rather, all these statutory provisions presume its prior existence. In its current form the Office of Appeals exists pursuant to section 7804(a), which provides:

SEC. 7804. OTHER PERSONNEL.

(a) APPOINTMENT AND SUPERVISION.—Unless otherwise prescribed by the Secretary, the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws, and the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to such persons.

Congress thus provided that, except as the Secretary otherwise prescribes, it is the Commissioner and not the Secretary who shall "employ" (not "appoint") other personnel in the Internal Revenue Service. [47] Pursuant to this congressional mandate, the Commissioner established the Office of Appeals and employed personnel to staff that office. The stated mission of the Office of Appeals is to resolve tax controversies without litigation. This mission as well as the operating directives and guidelines of the Office of Appeals are set forth in the Internal Revenue Manual (IRM). [48]

B. *A brief history of the Office of Appeals*

The first precursor to the Office of Appeals was established by statute—i.e., by the Revenue Act of 1918, ch. 18, 40 Stat. 1057. Then known as the Advisory Tax Board, it had the authority only to offer its recommendation on cases submitted to it by the Commissioner. The Advisory Tax Board was soon replaced by the Committee on Appeals and Review,

---

[46] See secs. 6015(c)(4)(B)(ii)(I) (innocent spouse relief), 6603(d)(3)(B) (deposits), 6621(c)(2)(A)(i) (interest rates), 7122(e)(2) (taxpayer appeal of denial of offer-in-compromise), 7123 (Appeals dispute resolution procedures), 7430(c)(2), (c)(7), (g)(2) (reasonable administrative and litigation costs), 7522(b)(3) (content of letter of proposed deficiency), 7612(c)(2)(A) (protection of confidential information on taxpayer software). Mr. Tucker describes section 7122(e) as if it provides for a "right to appeal * * * to an Appeals Officer", but the statute mentions no officer.

[47] One exception to this general rule is present in 5 U.S.C. sec. 9503(a) (2006), which authorizes the Secretary of the Treasury to appoint up to 40 individuals to critical administrative, technical, and professional positions in the IRS before July 23, 2013, provided that such individuals were not IRS employees before June 1, 1998, and that their appointments are limited to no more than 4 years.

[48] According to the Internal Revenue Manual (IRM), "The Appeals Mission is to resolve tax controversies, without litigation, on a basis which is fair and impartial to both the Government and the taxpayer and in a manner that will enhance voluntary compliance and public confidence in the integrity and efficiency of the Service." IRM pt. 8.1.1.1(1) (Oct. 23, 2007).

which was given the authority to hear administrative appeals from taxpayers and redetermine their deficiencies pursuant to the Revenue Act of 1921, ch. 36, 42 Stat. 227. The name and structure of the appeals function of the IRS has changed several times since then, [49] but its mission to resolve tax controversies without litigation has remained the same. See IRS Document 7225, History of Appeals, 60th Anniversary Edition 3–6 (Nov. 1987).

However, in the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. 105–206, 112 Stat. 685, Congress enacted provisions that directly addressed the appeals function. One of the four required features of the plan of reorganization that the IRS was to undertake was that it "ensure an independent appeals function within the Internal Revenue Service". *Id.* sec. 1001(a)(4), 112 Stat. 689. Explicit reference to the Office of Appeals was added to the Code not only in the new CDP procedures in sections 6320 and 6330 but also in sections 6015(c)(4)(B)(ii)(I), 7122(d)(2) (now designated (e)(2)), 7123, 7430(c)(2) and (g)(2)(A), and 7612(c)(2)(A).

### C. *"Appeals Officers" in the Office of Appeals*

### 1. *The Pre-CDP Role of the "Appeals Officer"*

The position of "Appeals Officer" has existed within the Office of Appeals since 1978. IRS Document 7225, *supra* at 3–5. Mr. Tucker does not argue that any Office of Appeals' personnel were "inferior Officers" before the passage of the RRA, but he asserts that as a result of the RRA those positions possessed authority that may be consitutionally exercised only by an "officer of the United States".

The position of "Appeals Officer"—as well as earlier positions within the Office of Appeals and its predecessors—had the authority to make deficiency determinations and hear collection-related appeals long before the passage of the RRA, which enacted the CDP regime. The appeals function had the

---

[49] The Committee on Appeals and Review was abolished on June 2, 1924, in favor of creating the Board of Tax Appeals because it was thought that a judicial tribunal would better serve taxpayers. IRS Document 7225, History of Appeals, 60th Anniversary Edition 3 (Nov. 1987). However, in response to the rapidly growing docket of the Board of Tax Appeals, the Special Advisory Committee was formed as a part of the Commissioner's office to reprise the role of the Committee on Appeals and Review. *Id.* This Court is the successor to the (statutory) Board of Tax Appeals, and the Office of Appeals is the successor to the Special Advisory Committee. See *id.*

authority to redetermine deficiencies since 1921. IRS Document 7225, *supra* at 3. And it had the authority to hear collection-related appeals under the collection appeals program (CAP) since 1996.[50] IRM pt. 8.24.1.1.1 (May 27, 2004).

"CAP is an administrative review program not required by statute." *Offiler v. Commissioner*, 114 T.C. 492, 494 (2000). In 1996 the IRS created CAP to provide taxpayers with the right to appeal lien, levy, and seizure actions. IRM pt. 8.24.1.1.1(1) (May 27, 2004). In 1997 CAP was expanded to implement the Taxpayer Bill of Rights 2, Pub. L. 104–168, 110 Stat. 1457 (1996), in order to provide taxpayers with the right to appeal the proposed termination of installment agreements. IRM pt. 8.24.1.1.1(2) (May 27, 2004); see also sec. 7122(e)(2). Although Congress did not codify CAP, the legislative history of the RRA shows that Congress was aware of CAP when it enacted the CDP regime (discussed below). See S. Rept. 105–174, at 92 (1998), 1998–3 C.B. 537, 628.

### 2. *"Collection Due Process" procedures added to the Code in 1998*

If a taxpayer fails to pay any Federal income tax liability after notice and demand, chapter 64 of the Code provides two means by which the IRS can collect the tax: First, section 6321 imposes a lien in favor of the United States on all the property of the delinquent taxpayer, and section 6323(f) authorizes the IRS to file notice of that lien; second, section 6331(a) authorizes the IRS to collect the tax by levy on the taxpayer's property.[51]

However, in 1998 Congress added to chapter 64 of the Code certain provisions (in subchapter C, part I, and in sub-

---

[50] Today both CAP and the CDP regime (discussed below) are administered by the Office of Appeals. IRM pt. 8.24.1.1.1 (May 27, 2004). As a result, a taxpayer may be eligible to request either a CAP or CDP hearing with respect to a lien or levy. *Id.* However, taxpayers are eligible for CAP hearings in more circumstances than CDP hearings. Publication 1660, Collection Appeal Rights 3 (rev. 03–2007). For example, a taxpayer is eligible for a CAP hearing when a CDP hearing is unavailable because the taxpayer already had a CDP hearing or failed to timely request such a hearing. IRM pt. 8.24.1.1.1(6) (May 27, 2004).

[51] Although this case involves only an Office of Appeals determination to sustain a notice of lien and not a determination to proceed with a levy, the function of the "appeals officer" that pertains to levies should be considered in determining the nature of that position. Cf. *Freytag v. Commissioner*, 501 U.S. at 882 ("The fact that an inferior officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his status under the Constitution. If a special trial judge is an inferior officer for purposes of * * * [some of his duties], he is an inferior officer within the meaning of the Appointments Clause and he must be properly appointed").

chapter D, part I) as "Due Process for Liens" and "Due Process for Collections". The IRS must comply with those provisions after filing a tax lien and before proceeding with a levy. Explicit mention of "appeals officers" was introduced by the RRA into these CDP provisions.[52] In the following brief description of those CDP procedures, we emphasize phrases from the statute that are important to the later analysis in this Opinion.

Within five business days after filing a tax lien, the IRS must provide written notice of that filing to the taxpayer. Sec. 6320(a). After receiving such a notice, the taxpayer may request an administrative hearing to "be held by the Internal Revenue Service *Office of Appeals*."[53] Sec. 6320(b)(1) (emphasis added). Similarly, before proceeding with a levy, the IRS must issue a final notice of intent to levy and must notify the taxpayer of the right to an administrative hearing to "be held by the Internal Revenue Service *Office of Appeals*." Sec. 6330(a) and (b)(1) (emphasis added). Section 6330(b)(3), entitled "Impartial *officer*" (emphasis added), provides that "[t]he hearing under this subsection shall be conducted by an *officer or employee* who has had no prior involvement with respect to the unpaid tax" at issue (emphasis added).

The pertinent procedures for the agency-level CDP hearing are set forth in section 6330(c). First, the statute provides, "The *appeals officer* shall at the hearing obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met." Sec. 6330(c)(1) (emphasis added). Second, the taxpayer may "raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy," including challenges to the appro-

---

[52] The Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. 105–206, 112 Stat. 685, also included three references to "appeals officers" that are not codified in the Internal Revenue Code. RRA section 3465(b), 112 Stat. 768, 1998–3 C.B. 228, provides: "The Commissioner of Internal Revenue shall ensure that an *appeals officer* is regularly available within each State"; RRA section 1001(a)(4), 112 Stat. 689, 1998–3 C.B. 149, provides that the reorganization plan should prohibit "ex parte communications between *appeals officers* and other Internal Revenue Service employees"; and RRA section 3465(c), 112 Stat. 768, 1998–3 C.B. 228, provides that the IRS should "consider the use of the videoconferencing of appeals conferences between *appeals officers* and taxpayers seeking appeals in rural or remote areas." (Emphasis added.)

[53] To the extent practicable, a CDP hearing concerning a lien under section 6320 is to be held in conjunction with a CDP hearing concerning a levy under section 6330, and the conduct of the lien hearing is to be in accordance with the relevant provisions of section 6330. See sec. 6320(b)(4), (c).

priateness of the collection action and offers of collection alternatives. Sec. 6330(c)(2)(A). Additionally, the taxpayer may contest the existence and amount of the underlying tax liability, but only if he did not receive a notice of deficiency or otherwise have an opportunity to dispute the tax liability.[54] Sec. 6330(c)(2)(B). Section 6330(c)(3) then provides, "The determination by an *appeals officer* under this subsection shall take into consideration" (emphasis added)— (1) the verification that he obtained, (2) the issues raised by the taxpayer, and (3) a balancing of the need for efficient tax collection with concerns that the collection be no more intrusive than necessary.

The authority to conduct CDP hearings and make determinations under sections 6320 and 6330 has been delegated to three positions within the Office of Appeals: (i) "Appeals Officers", (ii) "Settlement Officers", and (iii) "Appeals Account Resolution Specialists".[55] Appeals Delegation Order 8–a, IRM Exhibit 8.22.2–4 (Nov. 1, 2006). The authority to review and approve those determinations is delegated to team managers. *Id.* Today, in practice, settlement officers conduct CDP hearings and make an initial determination that is subsequently approved or overruled by a team manager, who makes the final determination on behalf of the Office of Appeals.

If the taxpayer is not satisfied with the determination he receives from the Office of Appeals, the taxpayer may "appeal such determination to the Tax Court". Sec. 6330(d)(1). Where challenges to the underlying liability are at issue (under section 6330(c)(2)(B)), the Tax Court reviews the determination de novo. *Davis v. Commissioner*, 115 T.C. 35, 39 (2000). For other disputes, the Tax Court reviews the determination for abuse of discretion, *Sego v. Commissioner*, 114 T.C. 604, 610 (2000); *Goza v. Commissioner*, 114 T.C. 176, 182 (2000)—that is, to determine whether the determination was arbitrary,

[54] Mr. Tucker did not challenge his underlying liabilities (which were, in fact, the liabilities that he himself had reported on his late returns). However, as we observed *supra* note 51, in order to determine the nature of the "appeals officer" position, we should consider all of its functions, not only those that were operative in this case.

[55] Mr. Tucker complains that "AARS is a fancy title for an even lower pay grade person who the IRS used to call a 'screener'" and that AARSs are "now holding CDP hearings in certain low-dollar situations". However, no CDP determination is issued until it has been reviewed and approved by a higher ranking team manager. If the Office of Appeals were to assign CDP hearings to employees untrained in or incapable of the task, their inadequate performance would be subject to review by this Court.

capricious, or without sound basis in fact or law, see *Murphy v. Commissioner*, 125 T.C. 301, 320 (2005), affd. 469 F.3d 27 (1st Cir. 2006).

Congress enacted these procedures in order to grant taxpayers "protections in dealing with the IRS that are similar to those they would have in dealing with any other creditor", that is, in order to "afford taxpayers adequate notice of collection activity and a meaningful hearing before the IRS deprives them of their property." S. Rept. 105–174, *supra* at 67, 1998–3 C.B. at 603. It is fair to say that the officer or employee who conducts the CDP hearing is performing a critical role in an important tax proceeding.

### 3. *Post-CDP hearing procedures*

However, because the "finality" of an Office of Appeals determination is relevant to the appeals officer's status as an "officer" under the Appointments Clause, it is pertinent to note the circumstances in which the IRS may face again the same taxpayer whose collection issues and underlying liability have been previously considered by the Office of Appeals in a CDP hearing, and to discern the extent, if any, to which the IRS will be bound to the determination made in the CDP context—either a determination on a liability issue (whether the tax is owed) or determination on a collection issue (whether and how the tax will be collected).

### a. *Collection issues*

If the CDP officer or employee enters into an installment agreement under section 6159, a closing agreement under section 7121, or an OIC under section 7122 with the taxpayer, then of course the agency will be bound under general contract principles to honor the agreement.[56] However the agency is also bound to honor such agreements that it enters into *outside* of the CDP context, whether by the Office of Appeals or by another branch of the IRS. Consequently, the authority to enter into such agreements on behalf of the IRS

---

[56] In addition, if an agreement embodied in Form 870–AD, "Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and of Acceptance of Overassessment", is accepted by the IRS and executed with the taxpayer, equitable estoppel may apply to make that agreement binding on all functions of the IRS. See *Kretchmar v. United States*, 9 Cl. Ct. 191, 198 (1985).

is not peculiar to an officer or employee conducting a CDP hearing.

However, the CDP hearing may yield a determination by the Office of Appeals that is not embodied in one of those agreements, such as a determination that the taxpayer should be put in "currently not collectible" (CNC) status, see IRM pt. 8.22.2.4 (Mar. 11, 2009), 8.23.3.13 (Aug. 28, 2009), or that a lien should be released or subordinated, see sec. 6325; IRM pt. 8.22.3.9.6.1 (Apr. 8, 2009), 8.22.3.9.6.2 (Oct. 19, 2007), 8.22.2.4.6 (Dec. 1, 2006), or that a levy should be released, see sec. 6343; IRM pt. 8.22.3.9.5 (Apr. 8, 2009). We find no authority addressing any binding character of these determinations, but we assume that their force is enhanced by section 6330(d)(2), which provides:

> (2) JURISDICTION RETAINED AT IRS OFFICE OF APPEALS.—The Internal Revenue Service Office of Appeals shall retain jurisdiction with respect to any determination made under this section, including subsequent hearings requested by the person who requested the original hearing on issues regarding—
>
>     (A) collection actions taken or proposed with respect to such determination; and
>
>     (B) after the person has exhausted all administrative remedies, a change in circumstances with respect to such person which affects such determination.

That is, we assume that the retention of "jurisdiction" by the Office of Appeals "with respect to any determination" would bar IRS collection personnel from contradicting Appeals' collection determination. If collection personnel undertook collection action in violation of Appeals' determination, then that action could be halted by Appeals in a retained jurisdiction hearing. Even so, the sense in which Appeals' collection determination can be said to be binding is qualified in several significant respects:

First, section 6330(d)(2) would bind only non-Appeals functions. The Office of Appeals itself, if it "retains jurisdiction", must retain jurisdiction to modify its determination.

Second, if the Office of Appeals sustains the notice of lien or intent to levy, there are circumstances in which the IRS[57]

---

[57] If the taxpayer challenges the validity of a lien in an action to quiet title under 28 U.S.C. sec. 2410 in Federal District Court, the Government will be represented not by the IRS attorneys in the Office of Chief Counsel but by the Department of Justice, pursuant to 28 U.S.C. sec. 516. If the Department of Justice concludes that the lien is not valid, then there is no ap-

Continued

thereafter may forgo collection or make accommodations nonetheless. Collection personnel may perform the investigation required by section 6331(j) and decide not to proceed with a levy against specific property. Collection personnel retain the power to withdraw a notice of lien pursuant to sections 6323(j), to release a lien pursuant to section 6325, and to release a levy pursuant to section 6343. The taxpayer is always free to submit to IRS collection personnel another proposal of an installment agreement or an OIC, and those personnel have authority to accept that new proposal notwithstanding the Office of Appeals' rejection of the taxpayer's prior proposal. See IRM pt. 1.2.44.2. [58]

Third, on the other hand, if the Office of Appeals determined not to sustain the notice of lien or of proposed levy that was challenged in a CDP hearing, IRS collection personnel would be free to issue another notice of lien or intent to levy, as long as the period of limitations for collection, see sec. 6502, remained open. The subject matter of a CDP hearing is the particular notice of lien or intent to levy that the taxpayer challenged under section 6320(a)(3)(B) or 6330(a)(3)(B).

Fourth, the National Taxpayer Advocate or her delegate can issue a Taxpayer Assistance Order (TAO) requiring the IRS to "release property of the taxpayer levied upon" or to "cease any action, take any action as permitted by law, or refrain from taking any action" with respect to its collection activities. See sec. 7811(b); 26 C.F.R. sec. 301.7811–1(c), Proced. & Admin. Regs.; see also IRM pt. 13.1.20.3(1) (Dec. 15, 2007) ("A TAO may be issued for either of two purposes: A. To direct the OD/Function [to] take a specific action, cease a specific action, or refrain from taking a specific action; or B. To direct the IRS to review at a higher level, expedite consideration of, or reconsider a taxpayer's case").

Fifth, by its nature a collection determination could be binding only until there has been a change in the taxpayer's circumstances. The collection issues that the officer or employee may address in the agency-level CDP hearing

parent basis for arguing that the Government is bound by the Office of Appeals' contrary determination sustaining the lien.

[58] See also H. Conf. Rept. 105–599, at 289 (1998), 1998–3 C.B. 747, 1020 ("A taxpayer could apply for consideration of new information, make an offer-in-compromise, request an installment agreement, or raise other considerations at any time before, during, or after the Notice of Intent to Levy hearing").

involve the financial circumstances of the taxpayer that, by their nature, may change after the hearing. See sec. 6330(d)(2)(B); 26 C.F.R. sec. 301.6330–1(e)(1), Proced. & Admin. Regs.; Rev. Proc. 2003–71, sec. 4.03, 2003–2 C.B. 517, 518. To decide whether the IRS ought to proceed with collection, the officer or employee is instructed by agency regulations to request and obtain detailed financial information about the taxpayer during the hearing, and to make a determination on the basis of that information. See 26 C.F.R. sec. 301.6330–1(e)(1), Proced. & Admin. Regs. ("Taxpayers will be expected to provide all relevant information requested by Appeals, including financial statements, for its consideration of the facts and issues involved in the hearing"). However, if and when a taxpayer later becomes ill or loses a job, or when a previously ill or unemployed taxpayer is healed or gets a job, then the position of the tax collector may well change. This reality is reflected explicitly in section 6330(d)(2)(B), which contemplates "a change in circumstances with respect to such person which affects such determination." Thus, an appeals officer's collection judgments reflected in a notice of determination issued after a CDP hearing are *not* necessarily the last word, even for the Office of Appeals itself—nor should they be. Instead, the Office of Appeals retains jurisdiction to continue to consider collection issues over time. This flexibility helps to ensure that, on a continuing basis, the IRS will tailor its collection activities to the taxpayer's current circumstances and that the IRS will not take collection action that is arbitrary or which creates unnecessary hardship for the taxpayer.

Sixth, if the taxpayer appeals an adverse determination to the Tax Court, then, as we have noted in part II.C.2 above, the appeals officer's collection decisions are reviewed in litigation. In that context, the determination is of course not binding on the Tax Court, which reviews for abuse of discretion. More important for evaluating "finality", however, is the fact that even the IRS as a litigant is not bound by the position in the Office of Appeals' notice of determination. In defending against that CDP appeal, the IRS (acting through its attorneys under the Chief Counsel) may re-think the appeals officer's collection decisions and may take a position—in the litigation or in the settlement of it—that is different from the position reflected in the Office of Appeals's

CDP determination. See 26 C.F.R. sec. 601.106(a)(1)(i), (d), Statement of Procedural Rules; Rev. Proc. 87–24, 1987–1 C.B. 720; General Counsel Order No. 4. (Jan. 19, 2001). It is the experience of this Court that the Office of Chief Counsel sometimes does not defend the Office of Appeals' determination but rather admits an abuse of discretion and moves the Court to remand the case to the Office of Appeals for a supplemental CDP hearing. In those instances the agency's position (as taken by Chief Counsel) contradicts the notice of determination, to which the agency is manifestly not bound.

Consequently, the CDP determination of the Office of Appeals is not necessarily the agency's last word on collection issues.

b. *Underlying liability*

As we noted above in part II.C.2, a taxpayer who did not have a previous opportunity to dispute the amount of his underlying tax liability may raise such a dispute in the agency-level CDP hearing, pursuant to section 6330(c)(2)(B). In such a circumstance, the officer or employee conducting the hearing for the Office of Appeals will determine the IRS's position on that taxpayer's liability. Respondent explains that, in practice, a settlement officer will conduct the CDP hearing and will refer the case to an appeals officer to consider the issue of underlying liability. When the appeals officer makes a determination with respect to the liability issue, the case is returned to the settlement officer, who addresses any collection issues and makes an initial determination that is subsequently approved or overruled by a team manager, who makes the final determination on behalf of the Office of Appeals. The settlement officer will not reconsider the appeals officer's determination with respect to the liability issue, and generally, neither will anyone else within the Office of Appeals.

We noted in *Lewis v. Commissioner*, 128 T.C. 48, 59 (2007) (quoting 26 C.F.R. sec. 601.106(a)(1)(ii), Statement of Procedural Rules), that "[t]he Appeals officer has the 'exclusive and final authority' to determine the liability."[59] On the

---

[59] This provision in the regulations does not actually create "exclusive and final authority" but rather presumes such authority on the part of "the regional commissioner" and then provides that Appeals personnel "represent" the regional commissioner in that authority. It is a provision generally applicable when the Office of Appeals has jurisdiction over a determination of liability.

other hand, it is clear that such determinations are not absolutely "final". See *Jackson v. Commissioner*, T.C. Memo. 1988–143 ("Determinations by the Commissioner are not judicial in nature, but rather are administrative determinations, and are not res judicata to bind him for subsequent years, or for that matter, the same taxable year"); 1B J. Moore, Moore's Federal Practice, par. 0.422[2], at 3403 (2d ed. 1974) ("It is axiomatic to the doctrines of res judicata and collateral estoppel that only judicial decisions are given conclusive force in subsequent legal proceedings. Thus determinations made by the Commissioner of Internal Revenue are not judicial in nature but administrative and are not res judicata to bind him for the same taxable year or for subsequent years"). We must therefore discern the sense in which the CDP determination of underlying liability may be said to be "final".

### i. *If the liability determination is favorable to the taxpayer*

If the liability determination made by the Office of Appeals in the CDP context is favorable to the taxpayer, then the CDP process generally ends with a unilateral agency determination not to proceed with collection.[60] Although the team manager in charge of the case has the authority to execute a closing agreement with the taxpayer under section 7121, see IRS Deleg. Order 97 (Rev. 34), IRM pt. 1.2.47.6 (Aug. 18, 1997), generally no closing agreement is executed, and no litigation ensues. Respondent states that, as with a liability determination in a notice of deficiency, "an underlying

It does apply when underlying liability is properly at issue in the CDP context, but its most frequent application must be in the non-CDP cases that come to the Office of Appeals for a deficiency determination. If the delegated authority to make the IRS's "exclusive and final" determination of a taxpayer's liability caused the Office of Appeals personnel to be "inferior Officers", then it would pose questions about the necessity of appointing even the Appeals personnel who handle *non*-CDP matters and the regional commissioners who possess this authority in the first instance and from whom the Office of Appeals receives this authority only derivatively.

[60] If a taxpayer in a CDP hearing proposes not a complete concession by the IRS but an offer-in-compromise (OIC) based on doubt as to liability, and if the Office of Appeals accepts the OIC, then the resulting agreement is binding on the IRS. However, that binding effect is not unique to the CDP process; rather, the OIC accepted in the CDP context has the same effect (no more, and no less) as an OIC accepted in any context. In the absence of an OIC or a closing agreement, the non-liability determination is simply reflected in the notice of determination, see IRM pt. 8.22.3.9(1) (Oct. 19, 2007) ("Abatement of Tax"), and then is effectuated either by Office of Appeals personnel directly, see IRM pt. 8.22.3.9.3.1 (Oct. 19, 2007) ("APS [Appeals Processing Services] will input adjustments to tax"), 8.22.3.9.3.1.1(2) (Oct. 19, 2007) ("APS will abate the SFR/ASFR assessment and reverse withholding as requested by the hearing officer"), or by collection personnel, see IRM pt. 5.1.9.3.10(6) (Dec. 15, 2003), 5.19.8.4.9(2) (Nov. 1, 2007), 5.19.8.4.14(1) (Nov. 1, 2007) ("CDP 'back-end' work").

liability determination in a CDP case is also binding on the Examination function. The Examination function generally has no opportunity to review Appeals' determination"; and we assume arguendo that this is correct.[61] However, this binding character is limited.

First, if it is true (as section 6330(d)(2) provides) that the Office of Appeals "shall retain jurisdiction with respect to *any* determination" (emphasis added), then it would seem that the Office of Appeals itself must have jurisdiction to reconsider its pro-taxpayer liability determination.

Second, if the taxpayer had paid all or part of the liability that had been at issue in a CDP hearing and thereafter sought a refund of it through litigation, no collateral estoppel or res judicata effect to govern the outcome of the refund suit would arise from the prior CDP determination. See *Jackson v. Commissioner, supra*. The case would be defended not by the IRS but by attorneys of the Department of Justice, see 28 U.S.C. sec. 516 (2006),[62] which also has settlement authority in such cases, see sec. 7122.[63] But even in refund suits handled by the Department of Justice the IRS must request any counterclaim, see sec. 7403, must give a defense recommendation, see 28 U.S.C. sec. 520 (2006), and must give its views on proposed settlements.[64] In that context, it is the Office of Chief Counsel, and not the Office of Appeals, that speaks for the IRS; and Chief Counsel is not bound by the appeals officer's CDP determination. IRM pt. 34.8.2.11.5(4)

---

[61] It is not clear why Examination would necessarily be bound by the CDP determination of a liability issue. A liability determination in a notice of deficiency (whether issued by the Office of Appeals or another IRS function) may acquire a quasi-binding character within the agency because section 6212(c) restricts the determination of further deficiencies (though section 6214(a) permits an increased deficiency if the matter is challenged in the Tax Court); but the CDP determination may arise in the absence of a notice of deficiency (as when a taxpayer disputes tax assessed pursuant to his own return) and does not result in the issuance of a notice of deficiency—so that section 6212(c) is not implicated. Amicus observes that the point has not been litigated but concludes that the liability determination in a CDP hearing is probably *not* binding elsewhere, citing *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929).

[62] By regulation, 28 C.F.R. sec. 0.15 (2007), it is the *Deputy* Attorney General (not one of the "Heads of Departments", in Appointments Clause parlance) who hires Department of Justice trial attorneys.

[63] An *Assistant* Attorney General heads the Tax Division and hires the Chiefs of the litigating sections in the Tax Division. See Memorandum of Dec. 29, 1999, to Heads of Department Components from then-Deputy Attorney General Eric Holder, available at http://www.usdoj.gov/jmd/ps/sesdelegmemo.htm. Settlement authority is delegated to those Chiefs. See Tax Division Directive No. 135, reprinted in 28 C.F.R. pt. O, subpt. Y, app.

[64] See *id*. (delegating settlement authority only in cases in which the agency agrees, and thereby requiring solicitation of IRS views to settle tax cases); see also "Department of Justice Tax Division Settlement Reference Manual", at 5–6, 16, available at http://www.usdoj.gov/tax/readingroom/foia/tax.htm.

(Aug. 11, 2004). The Government might therefore resist the refund claim—and might even plead a counterclaim—by asserting liabilities that the Office of Appeals did not sustain, taking its cue not from the Office of Appeals but from the Office of Chief Counsel, which must be independent and impartial. [65]

Thus, a pro-taxpayer CDP determination on underlying liability has at most a limited "finality" within the agency.

### ii. *If the liability determination is not favorable to the taxpayer*

If the liability determination made by the Office of Appeals in the CDP context is not favorable to the taxpayer, then there are several contexts in which the IRS may take a position different from that reflected in the CDP determination.

### (A). *CDP litigation*

The taxpayer may appeal the adverse CDP liability determination to the Tax Court, pursuant to section 6330(d). If the taxpayer does appeal, then the Tax Court reviews the liability issues de novo. *Davis v. Commissioner*, 115 T.C. at 39. In Tax Court proceedings the IRS is represented by the Office of Chief Counsel, see sec. 7452, which may re-think the liability issues and may take a position different from that reflected in the notice of determination. See IRM pt. 1.1.6.1 (quoted *supra* note 65). In addition, the Office of Chief Counsel—not the Office of Appeals—has the authority to settle CDP cases that reach litigation, see sec. 601.106(a)(2)(i), Statement of Procedural Rules; Rev. Proc. 87–24, 1987–1 C.B. 720, and it has the authority to settle CDP cases without the concurrence of the Office of Appeals, see Rev. Proc. 87–24, *supra*; IRM pt. 35.5.1.4.3(2), 35.5.2.7(2), 35.5.2.14(2)(B) (Aug. 11, 2004).

If the taxpayer who receives an adverse notice of determination reflecting the officer's or employee's decision about underlying liability decides *not* to appeal to the Tax Court, then the IRS may nonetheless meet this taxpayer again in a

---

[65] See IRM pt. 1.1.6.1 (July 29, 2005) ("Counsel must interpret the law with complete impartiality so that the American * * * [public] will have confidence that the tax law is being applied with integrity and fairness.").

variety of other circumstances in which, again, the CDP liability determination will not be binding on the IRS:

(B). *Audit reconsideration*

Audit reconsideration is a substantive review of the taxpayer's liability that may result in the abatement of an assessed tax liability. Specifically, audit reconsideration "is the process the IRS uses to reevaluate the results of a prior audit where additional tax was assessed and remains unpaid, or a tax credit was reversed." IRM pt. 4.13.1.2 (Oct. 1, 2006). The IRS's authority to conduct an audit reconsideration is grounded in section 6404(a), which provides that "[t]he Secretary is authorized to abate the unpaid portion of the assessment of any tax or any liability in respect thereof, which—(1) is excessive in amount, or (2) is assessed after the expiration of the period of limitations properly applicable thereto, or (3) is erroneously or illegally assessed."

Audit reconsideration is not precluded by a prior CDP determination. See IRM pt. 4.13.1.8 (Oct. 1, 2006) (listing circumstances in which "a request for [audit] reconsideration will not be considered"; prior CDP hearing is not listed). Therefore, a taxpayer who has received an adverse CDP determination with respect to his underlying liability could nonetheless have his liability redetermined in the course of an audit reconsideration.

(C). *District Court collection suit*

If the taxpayer does not pay the tax, the IRS may request the Department of Justice to file a collection suit against the taxpayer in Federal District Court. See sec. 7403(a) ("the Attorney General * * *, at the request of the Secretary, may direct a civil action to be filed in a district court"). It is the Office of Chief Counsel, and not the Office of Appeals, that decides for the IRS whether to make that request, and the Chief Counsel is not bound by the appeals officer's CDP determination of liability. See General Counsel Order No. 4 (rev. Jan. 19, 2001).

(D). *Request for abatement, refund claim, and refund litigation*

The taxpayer may request an abatement of tax, or he may pay the tax and claim a refund. We are aware of no reason or rule requiring that, when the IRS then considers administratively that request for abatement or claim for refund, it is bound by the appeals officer's adverse CDP determination. If the IRS denies a refund claim, the taxpayer may file a refund suit in Federal District Court or the Court of Federal Claims. As we noted above, the IRS will be asked for its defense recommendation and for its views on proposed settlements. In that context, it will be the Office of Chief Counsel, and not the Office of Appeals, that will speak for the IRS, and the Chief Counsel will not be bound by the appeals officer's CDP determination. See *supra* part II.C.3.b.i.

In sum, the collection and liability determinations made in CDP hearings by officers and employees of the Office of Appeals are an important aspect of the agency's administration of the tax law, and they affect to a greater or lesser extent the agency's ultimate position with regard to the tax liability and the collection of it. But there are numerous circumstances in which those determinations may not be the IRS's last word.

4. *The tax administration context of the CDP "officer or employee"*

The IRS personnel who are appointed by the President or the Secretary of the Treasury are the Commissioner, see sec. 7803(a)(1), the Chief Counsel, see sec. 7803(b)(1), members of the Internal Revenue Service Oversight Board, see sec. 7802(b)(1), and the National Taxpayer Advocate, see sec. 7803(c)(1). See also *supra* note 47. Personnel to fill other positions in the IRS are hired by the Commissioner pursuant to section 7804(a).

These hired, non-appointed positions include (i) the Deputy Commissioner for Services and Enforcement, who is delegated the authority to oversee the four primary operating divisions of the IRS, see IRM pt. 1.1.5.3 (Oct. 28, 2008); (ii) the Deputy Commissioner for Operations Support, who is delegated the authority to oversee the integrated support functions of the IRS, see IRM pt. 1.1.5.4 (Oct. 28, 2008); (iii) the

Commissioners of the Wage and Investment Division, the Small Business/Self-Employed Division, the Tax-Exempt and Government Entities Division, and the Large and Mid-Size Business Division, who are delegated the authority to supervise and manage those divisions, see IRM pt. 1.1.13.1 (Sept. 1, 2005), 1.1.16.1 (Mar. 1, 2007), 1.1.23.2 (Feb. 1, 2007), 1.1.24.1 (Nov. 1, 2006); (iv) the Deputy Chief Counsel (Technical), who serves as the principal deputy to the Chief Counsel, acts as Chief Counsel when that office is vacant, maintains jurisdiction over legal issues arising in published guidance, letter rulings, technical advice, and other processes, and participates in the interpretation and development of internal revenue laws, see IRM pt. 1.1.6.2 (Dec. 16, 2009), (v) the Deputy Chief Counsel (Operations), who maintains jurisdiction over issues arising in litigation nationwide and participates in the formulation of tax litigation policy, see IRM pt. 1.1.6.3 (Dec. 16, 2009), and (vi) the Chief of the Office of Appeals, who is delegated the authority to plan, manage, direct, and execute the nationwide activities of that office, see IRM pt. 1.1.7.1 (Feb. 5, 2008). [66]

Lower in the IRS hierarchy, these hired positions include revenue officers (at or above the rank of GS–9 [67]), who are delegated the authority (i) to issue, serve, and enforce summonses, to set the time and place for appearance, to take testimony under oath of the person summoned, and to receive and examine data produced in compliance with the summons, see IRS Deleg. Order 25–1 (formerly IRS Deleg. Order 4 (Rev. 23), 55 Fed. Reg. 7626); (ii) to issue notices of levy, see IRS Deleg. Order 5–3 (Rev. 1), IRM pt. 1.2.44.3 (Nov. 8, 2007); and (iii) to issue notices of Federal tax lien, see Delegation Order 5–4 (Rev. 1), IRM pt. 1.2.44.4 (Sept. 23, 2005). That is, revenue officers have the power—unless the CDP process intervenes—to effect the actual collection of tax.

---

[66] Justice Breyer would evidently characterize many of these personnel as "officers". See *Free Enter. Fund v. PCAOB*, 561 U.S. at ____ 130 S. Ct. at 3180 (Breyer, J., dissenting) ("by virtually any definition, essentially all SES [Senior Executive Service] officials qualify as 'inferior officers,' for their duties, as defined by statute, require them to 'direc[t] the work of an organizational unit,' carry out high-level managerial functions, or '*otherwise exercis[e]* important policy-making, policy-determining, or other executive functions.' §3132(a)(2) (emphasis added)").

[67] The General Schedule, abbreviated "GS", is the basic pay schedule for employees of the Federal Government. See 5 U.S.C. sec. 5332 (2006).

### 5. *The administrative law context of the CDP "officer or employee"*

Today the Federal Government employs a corps of about 5,000 hearing officers who adjudicate cases for dozens of its agencies. Raymond Limon, Office of Admin. Law Judges, Office of Pers. Mgmt., "The Federal Administrative Judiciary, Then and Now, A Decade of Change 1992–2002", at 3 (Dec. 23, 2002). Fewer than a third of those positions are classified as administrative law judges (ALJs) under the Administrative Procedure Act (APA), and the remainder of those positions are commonly referred to as non-ALJ hearing officers.[68] Over 80 percent of ALJs are currently employed by the Social Security Administration (SSA). OPM Report (showing the SSA employed 1,128 of 1,388 ALJs in June 2008). None of the SSA's ALJs are appointed by the Commissioner of the SSA, who serves as the department head. See Soc. Sec. Admin., ODAR Redelegations of Personnel and Equal Employment Opportunity Authorities (September 2006). Instead, the authority to appoint ALJs for the SSA is delegated to the Deputy Commissioner for the Office of Disability Adjudication and Review of the SSA. *Id.* Therefore, the great majority of ALJs are not appointed pursuant to the Appointments Clause.

ALJs are hired pursuant to 5 U.S.C. sec. 3105 (2006). An agency may appoint an individual as an ALJ only after the Office of Personnel Management certifies that individual as eligible for the position. 5 C.F.R. sec. 930.204 (2008). The APA generally requires that an ALJ preside over "every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing". 5 U.S.C. sec. 554 (2006). If the adjudication is a so-called on the record hearing, then the hearing is a "formal adjudication" that must adhere to the formal hearing procedures of the APA, which provide, inter alia, that each party is entitled to present oral or documentary evidence, submit rebuttal evidence, and conduct cross-examination. 5 U.S.C. secs. 554–557. When presiding over an "on the record" hearing, ALJs

---

[68] *Id.* at 1–4 (showing that the Federal Government employed 1,351 ALJs and 3,370 non-ALJ hearing officers in 2002); see also Office of Pers. Mgmt., Federal Administrative Law Judges, By Agency and Level, CDPF Status Report as of June 2008 (OPM Report) (showing the Federal Government employed 1,388 ALJs in June 2008). Justice Breyer determined that there are currently 1,584 ALJs. See *Free Enter. Fund v. PCAOB*, 561 U.S. at ___, 130 S. Ct. at 3180–3181 (Breyer, J., dissenting).

have the authority to require attendance at the hearing, to administer oaths and affirmations, to issue subpoenas, to rule on offers of proof and receive evidence, and to order depositions. *Id.*

However, if the relevant statute does not require an "on the record" hearing, then the formal hearing procedures of the APA do not apply and a non-ALJ hearing officer may preside over the adjudication. See *id.* Sections 6320 and 6330 do not require an "on the record" CDP hearing, see *Davis v. Commissioner*, 115 T.C. at 41–42 (citing 26 C.F.R. sec. 601.106(c), Statement of Procedural Rules); and thus even apart from section 6330(b)(3) (allowing a CDP hearing before "an officer or employee"), APA procedures would not require the IRS to use ALJs to conduct CDP hearings. Therefore, the appeals officer who conducts and adjudicates a CDP hearing is more comparable to a non-ALJ hearing officer than to an ALJ.

The CDP hearing officer, hired and not constitutionally "appointed", is by no means unique in the context of administrative adjudication.

III. *The status of the CDP "officer or employee" and "appeals officer" under the Appointments Clause*

In order to determine whether the "officer or employee" (or the "appeals officer") of section 6330 is an "inferior Officer" who must be appointed in compliance with the Appointments Clause, we consider the two issues prompted by the text of the clause.

A. *Whether the position is "established by Law"*

"[T]he threshold trigger for the Appointments Clause" is that an office be "'established by Law'". *Landry v. FDIC*, 204 F.3d at 1133. We hold that there is no CDP hearing officer position "established by Law" under sections 6320 and 6330 whose incumbent could be an officer subject to the Appointments Clause.

1. *Creation by statute*

Where "the 'duties, salary, and means of appointment' for the office were specified by statute", that is considered "a factor that has proved relevant in the [Supreme] Court's

Appointments Clause jurisprudence." *Id.* (quoting *Freytag v. Commissioner*, 501 U.S. at 881). If there were a statutory provision to the effect that "There shall be, within the Internal Revenue Service Office of Appeals, officers designated as Appeals Officers, who shall conduct CDP hearings", etc., then that would be some indication that the Appeals Officer position was "established by Law". There is no such statute, and this lack is some indication that the position in question is *not* an office "established by Law".

The IRS Office of Appeals was not, in its current form, initially created by the Internal Revenue Code,[69] nor were its "Appeals Officers". Congress did explicitly "establish" in the Internal Revenue Code certain officers who are to be appointed by the President, with the advice and consent of the Senate—i.e., the Commissioner, sec. 7803(a)(1), the Chief Counsel, sec. 7803(b)(1), and members of the Internal Revenue Service Oversight Board, sec. 7802(b)(1)—and the National Taxpayer Advocate (sec. 7803(c)(1)), who is appointed by the Secretary of the Treasury.[70] Otherwise, the employment of "Other Personnel" is authorized in Section 7804(a), which, as we noted above, simply provides that "the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper". Congress thus left to the Executive Branch almost the entire personnel structure of the IRS and refrained from establishing other particular offices within it.

As is shown above in part II.B, it was the Executive Branch that created the IRS Office of Appeals and its personnel structure, pursuant to that authority in section 7804(a). When Congress enacted in 1998 the CDP provisions in sections 6320 and 6330, it employed that pre-existing Office of Appeals and committed the new CDP function *to that office*. Secs. 6320(b)(1), 6330(b)(1), (d)(2). Mr. Tucker contends that the RRA established the pre-existing Appeals Officer position as the CDP hearing officer. The statute does

---

[69] Although the Office of Appeals was originally a creature of regulation, the multiple references to it that were added to the Code in 1998, see part II.B above, make it at least arguable that the Office of Appeals is now required by statute. However, there is no constitutional issue as to whether the Office of Appeals itself was "establish[ed] by Law"; rather, the issue is whether there are, within the Office of Appeals, personnel who are "officers" whose positions are "established by Law".

[70] The National Taxpayer Advocate's predecessor, the Taxpayer Advocate, was appointed by the Commissioner of Internal Revenue, pursuant to former section 7802(d)(1).

refer to an "appeals officer" as the person who "obtain[s] verification * * * that the requirements of any applicable law or administrative procedure have been met", sec. 6330(c)(1), and who makes the "determination" whether to proceed with collection, sec. 6330(c)(3). However, for the following reasons we conclude that section 6330 uses the term "appeals officer" interchangeably with the term "officer or employee":

First, the provisions in the lien statute, section 6320(b)(3), and in the levy statute, section 6330(b)(3), that actually state who shall conduct the hearing state that "the hearing * * * shall be conducted by an *officer or employee* who has had no prior involvement with respect to the unpaid tax". (Emphasis added.) This is the first and only mention of an individual in the lien statute and the first mention of an individual in the levy statute. The caption of each paragraph is "Impartial *officer*", thereby explicitly indicating that it might be an "officer *or employee*" who serves as the "Impartial *officer*". (Emphasis added.) This shows that Congress did not use the term "officer" in any specialized sense. The phrase "or employee" is so contrary to Mr. Tucker's position that he is forced to declare the phrase "mere surplusage". However, we decline to read words out of the statute; rather, we attempt to give meaning to every word that Congress enacted, and here that is best accomplished by taking at face value the phrase "officer *or employee*" in sections 6320(b)(3) and 6330(b)(3) (emphasis added), and by understanding the phrase "appeals officer" in section 6330(c)(1) and (3) as shorthand for an officer or employee in the Office of Appeals. If Congress had intended to assign CDP duty to a particular rank of "Appeals Officer", it would not have added the phrase "or employee"; and it could have used language like that which it used simultaneously in RRA section 3105 where it provided that a bond issuer could appeal an adverse ruling "to a *senior officer* of the Internal Revenue Service Office of Appeals". (Emphasis added.)

Second, the conference report describing the provision does on one occasion use the designation "*appeals* officer" but almost immediately thereafter uses the designation "*appel-*

*late* officer". H. Conf. Rept. 105–599, at 264 (1998), 1998–3 C.B. 747, 1018 (emphasis added).[71]

Neither the statute itself nor the legislative history shows that Congress intended to ascribe any particular importance or significance to the term "appeals officer". We hold that, for purposes of section 6330(c)(1) and (3), an "appeals officer" is any "officer or employee" in the IRS Office of Appeals to whom is assigned the task of conducting a CDP hearing under section 6330(b)(3).[72]

The statute thus does not create any positions for the personnel who would perform the CDP function but rather refers to them in a most diffuse manner ("conducted by an officer or employee"). After the enactment of this statute, it was not possible to point to a position responsible for conducting CDP hearings and to question whether the person in that position was an "inferior Officer"; instead the hearings would be conducted by "employees" yet to be designated, from time to time, within the Office of Appeals.[73] Thus, the mere mention of an "officer or employee" or an "appeals officer" in sections 6320 and 6330 presumes but does not establish any position.[74] In addition to sections 6320 and 6330, however, Mr. Tucker points to a reference to "appeals officer" in a provision of the RRA that has not been codified in the Code.[75] RRA section 3465(b), 112 Stat. 768, 1998–3 C.B. 228, provides:

The Commissioner of Internal Revenue shall ensure that *an appeals officer* is regularly available in each State. [Emphasis added.]

---

[71] See also S. Rept. 105–174, at 68 (1998), 1998–3 C.B. 537, 604 ("The determination of the *appeals* officer"; "the determination of the *appellate* officer"; "the *appellate* officer's determination" (emphasis added)).

[72] See *Powers v. Commissioner*, T.C. Memo. 2009–229; *Reynolds v. Commissioner*, T.C. Memo. 2006–192.

[73] Mr. Tucker sets out an elaborate hypothetical circumstance, intended to show the importance of appeals officers, in which an appeals officer could end up holding jurisdiction over the three major U.S. car manufacturers and thereby "effectively become the United States 'Car Czar'"; "she could effectively end the United States domestic automobile industry"; "She could be in charge of the companies' fates for years". Among the reasons that we are not influenced by this possibility is that it is the Office of Appeals, and not an individual officer or employee, that retains jurisdiction under section 6330(d)(2).

[74] The mere mention of an office in the Code evidently does not establish that office or guarantee its continuance. Other administratively created IRS positions have been mentioned from time to time in sections of the Code but have thereafter been abolished by agency restructuring and their functions delegated to other personnel. See, e.g., sec. 6334(e)(2)(A) (mentioning "district director"); sec. 7611(b)(3)(C) (mentioning "regional commissioner").

[75] For the two other uncodified references to "appeals officers" in the RRA, see *supra* note 52.

This provision, however, has little to do with the CDP hearing or its presiding "officer *or employee*". (Emphasis added.) The statute certainly does not establish (or even imply) a CDP hearing officer "in each State". That is, even if the statute were read to mean that "There shall be, and is hereby established, an IRS official known as 'Appeals Officer' in each State", Congress would not, by creating such an official, establish a CDP hearing officer, as Mr. Tucker's argument would require. Whatever that "appeals officer * * * in each state" might be tasked with doing, Congress made clear in sections 6320(b)(3) and 6330(b)(3) that a CDP hearing can be staffed by an "officer *or employee*". (Emphasis added.)

We therefore hold that the RRA did not establish the position of a CDP "appeals officer".

### 2. *Creation by regulation*

However, Mr. Tucker contends, in effect, that proper Appointments Clause analysis must consider both statute and regulations. We therefore consider whether an office might be "established" by the RRA taken together with the regime for the Office of Appeals that is established in the regulations. It is true that the case law does not posit a bright-line rule that would require an explicit statutory creation of an office before there can be an "officer" for purposes of the Appointments Clause. Opinions of the Courts of Appeals for the Third, Fifth, and Sixth Circuits seem to tend to the contrary: [76]

The Administrative Review Board (ARB) of the Department of Labor, composed of three "members" appointed by the Secretary of Labor, "'issu[es] final agency decisions on questions of law and fact arising in review or on appeal' in whistleblower cases." *Willy v. Admin. Review Bd.*, 423 F.3d 483, 491 (5th Cir. 2005) (quoting 61 Fed. Reg. 19978 (May 3, 1996)). The ARB was created not by statute but by an order of the Secretary of Labor, pursuant to 5 U.S.C. sec. 301 (2006), which provides that "[t]he head of an Executive department

---

[76] In *Free Enter. Fund v. PCAOB*, 561 U.S. at ___, 130 S. Ct. at 3179 (Breyer, J., dissenting), Justice Breyer asserts explicitly that an "office" can be "created either by 'regulations' or by 'statute,'" for which he cites *United States v. Mouat*, 124 U.S. 303, 307–308 (1888) ("there is no statute authorizing the secretary of the navy to appoint a pay-master's clerk, nor is there any act requiring his approval of such an appointment, and the *regulations* of the navy do not seem to require any such appointment or approval for the holding of that position. The claimant, therefore, was not an officer" (emphasis added)).

* * * may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business". Both the Courts of Appeals for the Fifth Circuit, see *Willy v. Admin. Review Bd.*, 423 F.3d at 491–492, and the Sixth Circuit, see *Holtzclaw v. Sec. of Labor*, 172 F.3d 872 (6th Cir. 1999); *Varnadore v. Sec. of Labor*, 141 F.3d 625, 631 (6th Cir. 1998), approved the creation of the ARB as being within the general authority granted to the Secretary of Labor under 5 U.S.C. sec. 301 (2006), analyzed the position of member on the ARB under the Appointments Clause and found it to be an "inferior Officer", and held that Congress, by 5 U.S.C. sec. 301, had authorized the Secretary to make the appointments, which satisfied the requirements of the Appointments Clause.

Similarly, the Appeals Board of the Department of Health and Human Services (HHS), composed of members appointed by the Secretary of HHS, resolves disputes under the Child Support Enforcement Act, 42 U.S.C. secs. 651–669(b) (2006). *Pennsylvania v. HHS*, 80 F.3d 796, 800 (3d Cir. 1996). The Appeals Board was created not by statute but by regulation, 45 C.F.R. pt. 16 (1981), promulgated by the Secretary of HHS, pursuant to 42 U.S.C. sec. 913 (2006), which provides: "The Secretary is authorized to appoint and fix the compensation of such officers and employees, and to make such expenditures as may be necessary for carrying out the functions of the Secretary under this chapter." The Court of Appeals for the Third Circuit approved the creation of the Appeals Board as being within the general authority granted to the Secretary of HHS under 42 U.S.C. sec. 913, analyzed the position of member on the Appeals Board under the Appointments Clause and found it to be an "inferior Officer", and held that Congress, by 42 U.S.C. sec. 913, had authorized the Secretary to make the appointments, which satisfied the requirements of the Appointments Clause. *Pennsylvania v. HHS, supra* at 804–805.

None of these opinions suggests that any party had argued that the positions under review were not "established by Law". Rather, the parties and the courts seem to have assumed that if the positions existed, then the positions were

"established by Law". [77] If this assumption is correct, then it would seem that any "Office" that actually exists in the Federal Government is arguably "established by Law".

The Supreme Court has not so held, and the assumption is problematic, in that it risks reading out of the Constitution the phrase "established by Law", if the Appointments Clause would mean the same thing with or without that phrase. One could argue instead that only a position created by a statute can be "established by Law" for purposes of the Appointments Clause. If a position is created not by Congress but by the Executive, then by definition there is no possibility that Congress both created and filled that position, which is the chief danger against which the clause is a safeguard.

However, if the phrase "established by Law" were construed to mean that the Appointments Clause can apply only to a position expressly created by a statute, then abuses could arise. For example, Congress could take a pre-existing low-level position (which had been created by the Executive Branch pursuant to a general authorization like section 7804(a), and which was not subject to appointment by the President or a Head of a Department) and could invest it with significant additional power, thus evading the Appointments Clause by seeming to avoid "establishing" the office. [78] Where such a pattern existed, the courts would have to see through the subterfuge and enforce the Appointments Clause. Mr. Tucker argues that the CDP provisions involve just this problem—i.e., that Congress took the existing Appeals Officer position and invested it with the "significant authority" (discussed below in part II.B.2) of the CDP process.

The argument fails, however, because Congress has assigned the CDP hearing function not to a particular rank or title of "Appeals Officer" nor to any other identifiable officeholder but generally to the Office of Appeals and, within it, to any "officer or employee", secs. 6320(b)(3), 6330(b)(3), from among the "number of persons" who are employed in that

---

[77] For a defense of this position, see Stephen G. Bradbury, "Officers of the United States Within the Meaning of the Appointments Clause", 31 Op. Off. Legal Counsel, at *36–38, 2007 OLC LEXIS 3, *117–123 (Apr. 16, 2007).

[78] An analogous abuse via "indirection" was hypothesized in *Springer v. Govt. of the Philippine Islands*, 277 U.S. 189, 202 (1928), when the Court stated: "the legislature cannot ingraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection". The Court did go on to observe that "the case might be different if the additional duties were devolved upon an appointee of the executive", *id.*, but it did not elaborate on this scenario.

Office "as the Commissioner deems proper for the administration and enforcement of the internal revenue laws", sec. 7804(a). Likewise, even under the regulations the CDP responsibility does not inhere in any specific office or position. Pursuant to the administrative arrangements of the Office of Appeals, 250 employees are designated to perform that CDP function, but it is within the agency's authority under section 6330 to allocate the function as it will among its 1,100 settlement officers and Appeals Officers. The Appointments Clause applies only when an office is "established by Law", but there is no office established by statute or regulation to which Congress committed the CDP function.

### B. *Whether the CDP function could constitute an "office"*

If, however, a position is "established by Law", the second question in an Appointments Clause inquiry is whether that position constitutes an office of the United States. Only "offices" are subject to the requirements of the clause, and not every position that is "established by Law" is an office.[79] See *Freytag v. Commissioner*, 501 U.S. at 880–881. Assuming arguendo that the CDP function prescribed under sections 6320 and 6330 and the regulations thereunder is committed to a position "established by Law", we must determine whether that position could constitute an "office".

The Supreme Court has articulated two essential characteristics that a position must have in order to constitute an office: A position is an office if (i) it is invested with "significant authority pursuant to the laws of the United States", *Buckley v. Valeo*, 424 U.S. at 126, and (ii) it is "continuing", *Auffmordt v. Hedden,* 137 U.S. 310, 326–328 (1890); *United States v. Germaine*, 99 U.S. at 511–512;

---

[79] The requirements of the Appointments Clause are not implicated unless an "office" exists. *Freytag v. Commissioner*, 501 U.S. at 880 (citing *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976)). Even if the position of a non-officer employee is clearly established by law, i.e., "the duties, salary, and means of appointment * * * are specified by statute", *id.*, at 881, appointments to that position need not conform to the Appointments Clause, *id.* at 880–881. In *Freytag*, the Supreme Court noted that the position of Special Trial Judge on this Court is "established by Law", but nonetheless stated that Special Trial Judges "need not be selected in compliance with the strict requirements of [the clause]" "if we * * * conclude that a special trial judge is only an employee". *Id.* Likewise, in *Landry v. FDIC*, 204 F.3d 1125, 1133–1134 (D.C. Cir. 2000), the Court of Appeals for the District of Columbia Circuit noted that the position of ALJ for the Federal Deposit Insurance Corporation is "established by Law", but held that the position does not constitute an office. Moreover, the history of internal revenue collection in the United States is replete with officials whose positions were specified by statute, but were not appointed pursuant to the requirements of the clause. See *supra* pt. II.C.2.c.

*United States v. Hartwell*, 73 U.S. 385, 393 (1868). Whether a position possesses these characteristics and thus constitutes an office "is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties and appointment thereto." *Burnap v. United States*, 252 U.S. 512, 516 (1920). Therefore, we examine the specific features of the "officer or employee" position within the CDP function to determine whether it is a "continuing" office invested with "significant authority".

1. *Whether the CDP provisions created a "continuing" position*

A position is "continuing" if it possesses "'tenure, duration, emolument, and duties'" that are "'continuing and permanent, not occasional or temporary.'" *Auffmordt v. Hedden, supra* at 327 (quoting *United States v. Germaine, supra* at 511–512). A position is most clearly "continuing" if it is permanently assigned sovereign authority that does not expire, inter alia, upon the passage of time or the completion of a discrete task. See *Auffmordt v. Hedden, supra* at 326–328; *United States v. Germaine, supra* at 511–512; *United States v. Hartwell, supra* at 393. Respondent concedes that, if the CDP "appeals officer" is a position "established by Law", then it is a "continuing" position; and we therefore proceed to consider whether that position is given "significant authority", so that the person holding that position would be an officer (i.e., an "inferior Officer") rather than a non-officer employee.

2. *Whether the CDP hearing officer has "significant authority"*

In *Buckley v. Valeo, supra* at 126, the Supreme Court held that a position invested with "significant authority" is an office:

We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in *United States v. Germaine, supra*, is a term intended to have substantive meaning. We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article.

In that case the Supreme Court examined the powers of the eight-member Federal Election Commission (FEC) established under the Federal Election Campaign Act of 1971 (1971 Act), Pub. L. 92–225, 86 Stat. 3, as amended by the Federal Election Campaign Act Amendments of 1974, Pub. L. 93–443, 88 Stat. 1263. *Id.* at 137–141. The Supreme Court concluded that none of the FEC's commissioners were appointed in conformity with the clause, and thus, none of them were constitutionally permitted to exercise "significant authority". *Id.* at 137. It then sorted the FEC's statutorily authorized powers into three categories in order to determine whether the powers in each category constituted significant authority:

[T]he Commission's powers fall generally into three categories: functions relating to the flow of necessary information—receipt, dissemination, and investigation; functions with respect to the Commission's task of fleshing out the statute—rulemaking and advisory opinions; and functions necessary to ensure compliance with the statute and rules—informal procedures, administrative determinations and hearings, and civil suits. [*Id.*]

The Supreme Court held that it was constitutionally permissible for the unappointed commissioners to exercise their investigatory and informative powers, because in so doing they were merely aiding Congress in performing its legislative function. *Id.* at 137–138. Since Congress could delegate those powers to its own committees, the Supreme Court stated "there can be no question" that Congress could delegate them to the FEC by statute. *Id.*

However, the Supreme Court held that it was not permissible for the unappointed commissioners to exercise their "more substantial [enforcement and interpretive] powers". *Id.* at 138. First, the Supreme Court held that only "Officers of the United States" could exercise the commissioners' power to bring suit to enforce the 1971 Act, because that power "is the ultimate remedy for a breach of the law" and belongs to the Executive—not Legislative—Branch. *Id.* at 138–140. Second, the Supreme Court held that only "Officers of the United States" could exercise the commissioners' power to interpret the entire 1971 Act through rulemaking, advisory opinions, and determinations—without supervision from either Congress or the Executive Branch—because that power "represents the performance of a significant governmental duty exercised pursuant to a public law." *Id.* at 140–

141. From *Buckley* we therefore draw the general principle that only an "officer" may perform "significant" enforcement and interpretive functions. See *id.* at 124–141. In particular, the powers (i) to bring suit to enforce an Act of Congress and (ii) to issue regulations, advisory opinions, and determinations without supervision under an Act of Congress both constitute "significant authority".

The Supreme Court has yet to fully define the term "significant authority";[80] and "ascertaining the test's real meaning requires a look at the roles of the employees whose status was at issue in other cases." *Landry v. FDIC*, 204 F.3d at 1133. In the two cases most analogous to our facts, the Supreme Court in *Freytag* and the Court of Appeals for the District of Columbia Circuit in *Landry* analyzed whether different adjudicative positions constituted "offices". In *Freytag* the Supreme Court faced the question whether a Special Trial Judge (STJ) of the Tax Court is an "inferior Officer"; and it observed that in some matters the STJ will "only hear the case and prepare proposed findings and an opinion" while in other matters the STJ may be assigned "not only to hear and report on a case but to decide it". *Freytag v. Commissioner*, 501 U.S. at 873. In deciding that STJs are "inferior Officers", the Supreme Court relied on the authority of STJs to render the final decision of this Court in some of the matters that come before them. See *id.* at 882.

In contrast, in *Landry v. FDIC, supra* at 1134, the Court of Appeals decided that ALJs for the Federal Deposit Insurance Corporation (FDIC) are *not* inferior officers. Both the ALJs in *Landry* and the STJs on this Court "'take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders.'" *Id.*

---

[80] While "significant authority" is an essential characteristic of an "office", *Buckley v. Valeo*, 424 U.S. at 126, this proposition cannot be construed to mean that non-officer employees of the Federal Government are insignificant or trivial. Mr. Tucker suggests that treating "appeals officers" as non-officer employees not subject to the Appointments Clause is to regard them as "unimportant". We disagree. For example, military ranks reflect the same distinction between officers who are appointed in compliance with the Appointments Clause, see 10 U.S.C. secs. 531, 571, 624 (2006), and non-officers who are not. However, those non-officers include "noncommissioned officers" (sergeants, corporals, and petty officers) who are promoted (not appointed) from among enlisted personnel. See, e.g., Army Regulation 600–8–19 ("Enlisted Promotions and Reductions"), ch. 3 ("Semicentralized Promotions (Sergeant and Staff Sergeant)"), sec. 3.1. No one could reasonably call the role of noncommissioned officers "insignificant". They have command of the enlisted personnel under them, and insubordination or disobedience of their commands is punishable by court-martial. See 10 U.S.C. sec. 891 (2006). Thus, the issue here is not whether appeals officers are unimportant, but whether they are "Officers of the United States".

(quoting *Freytag v. Commissioner*, 501 U.S. at 881–882). However, unlike the STJs, the ALJs lacked the power to make final decisions. *Id.* at 1133. Instead, ALJs file a recommended decision, 12 C.F.R. sec. 308.38 (1996), which the FDIC's board of directors reviews de novo before it issues the final decision of the agency, *id.* sec. 308.40(a), (c). This lack of finality led the Court of Appeals to conclude that the ALJs in question are not officers. *Landry v. FDIC, supra* at 1134.

This focus in *Landry* on final decision-making power is an appropriate application of the Supreme Court's earlier analysis of the FEC's interpretive powers in *Buckley v. Valeo*, 424 U.S. at 140–141, which held that the power to interpret the 1971 Act "free from day-to-day supervision of either Congress or the Executive Branch" constitutes significant authority. The power to make a final decision, which the Supreme Court described as "independent authority" in *Freytag v. Commissioner, supra* at 882, is a species of the power to act without supervision. See *Buckley v. Valeo, supra* at 141. Therefore, a position that is invested with broad adjudicative powers, like the position of STJ, may be an office if the incumbent can act free of supervision or has the final say within the agency. See *Freytag v. Commissioner, supra* at 882. However, such a position is not an office if the incumbent and her determinations are subject to supervision. See *Landry v. FDIC, supra* at 1133–1134.

Mr. Tucker and the amicus contend that the positions of settlement officer and team manager within the Office of Appeals are invested with "significant authority". In particular, Mr. Tucker posits that "Settlement Officers, and/or Appeals team managers holding CDP hearings are so similar to Special Trial Judges in all ways that mattered to the Supreme Court in its *Freytag* Appointments Clause analysis that any differences are not of Constitutional significance." We disagree.

While settlement officers, appeals officers, and team managers can be said to possess adjudicative powers to conduct hearings and to issue determinations to resolve those hearings, none possess the power to make final decisions for the IRS. Contrary to Mr. Tucker's assertion that "[n]otices of determination issued by Appeals personnel after CDP hearings are final and binding on the IRS", determinations by settlement officers and Appeals team managers are *not*

"final" in the sense that is relevant to the Appointments Clause. They review only a particular collection episode—a given notice of lien or notice of proposed levy. As is discussed above in part II.C.3.a, in the absence of a written agreement with the taxpayer, the Office of Appeals (not the appeals officer) retains jurisdiction to reconsider and overturn its personnel's determinations with respect to collection action. Sec. 6330(d)(2). If Mr. Tucker's circumstances were to change, and it became clear that he could never repay the IRS, nothing would prevent collection personnel from relenting or prevent the Office of Appeals from holding a supplemental CDP hearing and revising its personnel's prior determination to uphold the tax lien.

Even determinations with respect to underlying liability by the personnel of the Office of Appeals are not binding on the IRS and may be overturned during audit reconsideration or overruled by the IRS Office of Chief Counsel in taking litigation positions or settling cases. See *supra* part II.C.3.b. The Office of Chief Counsel, not the Office of Appeals, has authority to "[n]egotiate or make a settlement in any case docketed in the Tax Court if the * * * determination was issued by Appeals officials". 26 C.F.R. sec. 601.106(a)(2)(i), Statement of Procedural Rules. Here, the Office of Chief Counsel was free to contest or settle Mr. Tucker's case, notwithstanding the team manager's determinations to uphold the tax lien at issue.

No position within the Office of Appeals is invested, in the CDP context, with the "final" decision-making power that may be exercised only by an "officer of the United States". For that reason, settlement officers, appeals officers, and team managers are more analogous to the ALJs in *Landry* than to the STJs in *Freytag*.

Moreover, non-officer ALJs have the authority to conduct "on the record" hearings, to require attendance at those hearings, to administer oaths and affirmations, to issue subpoenas, to rule on offers of proof and receive evidence, and to order depositions. 5 U.S.C. secs. 554–557. Despite this authority, the Court of Appeals for the District of Columbia Circuit held that the ALJs in *Landry* are *not* officers because they lack final decision-making power. *Landry v. FDIC*, 204

F.3d at 1133–1134. [81] In contrast, settlement officers, appeals officers, and team managers lack not only final decision-making power but also these formal powers granted to ALJs under the Administrative Procedure Act. See 26 C.F.R. sec. 301.6330–1(d)(2), Q&A–D6, Proced. & Admin. Regs. CDP hearings are "informal in nature" and do not even require a face-to-face meeting. *Id.*

Since we find persuasive the reasoning of the Court of Appeals for the District of Columbia Circuit in its determination that ALJs for the FDIC do not exercise "significant authority", we hold that the lesser position of CDP "appeals officer" ("or employee") within the Office of Appeals likewise does not exercise "significant authority". We therefore hold that the positions of settlement officer, appeals officer, and team manager are not invested with "significant authority" under *Buckley v. Valeo*, 424 U.S. at 126.

## *Conclusion*

An "officer or employee" of the IRS Office of Appeals who conducts CDP hearings has neither a position "established by Law" nor "significant authority" that is characteristic of an "officer of the United States" for purposes of the Appointments Clause. Without at all minimizing the importance of conducting a CDP hearing, that function does not involve an authority more "significant" than the authority exercised by other personnel important to tax administration (whether the Chief of the Office of Appeals (their superior), other high-ranking officials in the IRS, or many internal revenue collection personnel over the past 200 years) or as significant as the authority exercised by ALJs in many other agencies. To survey these thousands of employees important to the administration of law and single out IRS "appeals officers" as

---

[81] The status of ALJs as employees or "Officers of the United States" is "disputed". *Free Enter. Fund v. PCAOB*, 516 U.S. at ____ n.10, 130 S. Ct. at 3160 (citing *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000)). In *Landry* a divided panel of the Court of Appeals for the D.C. Circuit held that ALJs for the FDIC are not officers. However, in *Free Enter. Fund v. PCAOB*, dissenting Justice Breyer apparently indicates that he would hold that all ALJs are officers. 516 U.S. at ____, 130 S. Ct. at 3180 (Breyer, J., dissenting) (citing *Freytag v. Commissioner*, 501 U.S. at 910 (Scalia, J., concurring in part and concurring in judgment)). No court has held contrary to *Landry*, and we follow it. However, even assuming arguendo that ALJs are "Officers of the United States", it does not follow that CDP hearing officers are likewise "officers". CDP hearing officers lack not only final decision-making power but also the formal powers granted to ALJs. Whether or not the position of ALJ constitutes an "Office[ ] of the United States", the lesser position of CDP "appeals officer" is not an "office".

somehow requiring constitutional appointment would be unwarranted. They are instead properly hired, pursuant to section 7804(a), under the authority of the Commissioner of Internal Revenue.

To reflect the foregoing,

*An appropriate order will be issued.*